**UNITED STATES of America**

**v.**

**Thomas PHIFER et al.**

**Crim. No. 74–136.**

United States District Court,
E. D. Pennsylvania.

June 24, 1975.

Alan M. Lieberman, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

David Zwanetz, Philadelphia, Pa., for Tallon.

Anthony J. DeFino, Philadelphia, Pa., for Phifer.

William F. Coyle, Philadelphia, Pa., for Smith.

## MEMORANDUM AND ORDER

BRODERICK, District Judge.

This matter comes before the Court on the defendants' motions for a new trial or, in the alternative, for a judgment of acquittal. The three defendants were jointly tried and were convicted by a jury as charged in the indictment.

All the defendants in this case were charged in Count No. I of the three-count indictment with conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846. Only the defendants, Thomas Phifer and Bruce Tallon, were named in Counts II and III of the indictment which charged, respectively, possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) and interstate travel in aid of the promotion of an unlawful activity, to wit, the distribution of marijuana in violation of 18 U.S.C. § 1952. The motions filed by the defendants raise a variety of points which may be enumerated as follows:

1. All the defendants contend that the jury's verdict is contrary to the

weight of the evidence and that the evidence was insufficient to sustain the conviction.[1]

2. All the defendants claim that the admission of evidence obtained from a warrantless search of an airplane in which defendants Phifer and Tallon were passengers was error.

3. Defendant Phifer and Smith assert that a violation of the Court's Order of Sequestration constituted a denial of the full effectiveness of cross-examination.

4. Defendant Smith contends that the Court erred in refusing his request for a copy of the transcript of the informant's Grand Jury Testimony of January 31, 1974 in the United States District Court for the Southern District of California.

5. Defendant Smith contends that the Court erred in refusing his requested points for charge numbers 17, 18 and 19.

6. Defendant Smith contends that the Government failed to prove that marijuana is a non-narcotic controlled substance.

7. Defendant Smith asserts that the Government "trapped", "lured" and "enticed" him to object to the Government's attempt to elicit fingerprint evidence from a Government agent not qualified to so testify, thereby prejudicing the defendant.

8. The defendant Tallon contends that the Court erred in permitting hearsay to be admitted against him.

1. *Weight and Sufficiency of the Evidence.*

■ In their motions for a new trial the defendants contend that the jury's verdict was against the weight of the evidence. A motion for a new trial is made pursuant to Rule 33 of the Federal Rules of Criminal Procedure which provides that the court may grant a new trial "if required in the interest of justice". A motion for a new trial on the ground that the verdict is against the weight of the evidence is directed to the sound discretion of the trial court and the court may weigh the evidence and consider the credibility of witnesses. *United States v. Morris*, 308 F.Supp. 1348 (E.D.Pa.1970). Indeed, it has been said that when ruling on such a motion the court sits as a thirteenth juror. 2 *Wright & Miller, Federal Practice and Procedure: Criminal* § 553, at 487. If the court concludes that the verdict is contrary to the evidence, or its weight, and that a miscarriage of justice may have resulted, the verdict may be set aside and a new trial granted. However, the remedy is to be sparingly used and only in exceptional circumstances. *United States v. Leach*, 427 F.2d 1107 (1st Cir. 1970). In reviewing the evidence and assessing the credibility of the witnesses, we find that the verdict in this case is fully justified by the evidence.

■ Briefly summarized, the Government established the following by the testimony of the Government informant in the case, Mr. Melvin Qualls.[2]

In mid-November, 1973, Melvin Qualls was approached by Kenneth Wells, an indicted co-conspirator in this case, and had a conversation with Mr. Wells. As a result of this conversation, Mr. Qualls purchased for Mr. Wells an airplane, a Piper Cherokee 140, No. N627OW, placing the airplane in his own name at Mr. Wells' request. After the aircraft had been purchased, there was a meeting held on November 20, 1973 at the home of defendant Smith in Orange, California. Present at this meeting were Mr. Qualls, Mr. Wells and defendants Phifer and Smith. The topic of the conversa-

---

1. In this regard, the defendant Tallon specifically claims that the Government failed to prove that he entered the conspiracy or had knowledge of the nature of the contraband seized in this case.

2. The evidence developed at the suppression hearing will be recounted under the heading below which treats the issue of the search in this case.

tion was that defendants Smith and Phifer wanted to smuggle marijuana into the United States from Mexico using Mr. Qualls and Mr. Wells for the necessary transportation involved. Smith and Phifer wanted to use a Mexican named Jose Morales as the supplier. Mr. Qualls was to fly the marijuana from Ensenada, Mexico to Los Angeles in the Piper Cherokee 140 that he had purchased. On November 25, 1973, Mr. Qualls, with defendants Smith and Phifer on board, flew the airplane from a small uncontrolled airport near Los Angeles to Ensenada, Mexico. Upon arriving at Ensenada, they went to their motel and defendant Smith left to call Jose Morales. Mr. Morales came to the motel, picked up Mr. Qualls and defendants Smith and Phifer and proceeded to Morales' house. Mr. Morales asked for the money Smith and Phifer owed him for a previous load and they promised to pay Mr. Morales as soon as "Bruce" had returned from the east. They then began discussing the feasibility of flying a load of marijuana to California from Mexico. Mr. Morales stated that he expected a thousand or twelve hundred pounds of marijuana to be available shortly. Later the same day, they looked for and found possible landing sites for the airplane. The next day defendant Smith and Mr. Qualls returned to California in the airplane, while defendant Phifer went by land in an effort to avoid the U. S. Customs clearance registry.

The following day, November 27, 1973, there was another meeting at Smith's house attended by Mr. Qualls, Mr. Wells and defendants Smith and Phifer. At that meeting, the method of transporting the marijuana back to Philadelphia was discussed and defendants Smith and Phifer decided that the marijuana should be flown back to Philadelphia rather than have "Bruce" drive it back. The following day, November 28, 1973, Mr. Qualls flew to Ensenada, Mexico, with Roger Meador in the Piper Cherokee 140. Mr. Qualls and Mr. Meador landed on the site that had been explored by defendants Smith and Phifer, met with Mr. Morales, and loaded bundles of marijuana onto the airplane. Mr. Qualls then flew the airplane by himself back to California, avoided U. S. Customs and landed at Corona Airport. Upon landing and parking the airplane, Mr. Qualls proceeded to his car where he met · with defendant Phifer who was waiting with his own car, and they drove both cars back to the airplane where they proceeded to load both cars with the marijuana. Mr. Qualls and defendant Phifer then drove their cars loaded with the marijuana to Smith's house. Defendant Smith and Mr. Qualls then proceeded in Mr. Qualls' car to a building in Fullerton, California, took the marijuana from Qualls' car, placed it in 55-gallon drums, stored it in the building and returned to Smith's house. The following day, November 29, 1973, there was a meeting at Smith's house, attended by defendants Smith and Phifer, Mr. Wells and Mr. Qualls and again they discussed the method of transporting the marijuana to Philadelphia. Defendants Smith and Phifer decided to put the marijuana into boxes and transport it to Philadelphia in a Cessna 421 aircraft. It was also decided at this meeting that the next load from Mexico should be put in boxes in Ensenada, Mexico, and that Roger Meador and defendant Smith should take the boxes to Mr. Morales in Ensenada.

On December 2, 1973, a meeting was held at Gary Barney's house in Riverdale, California, attended by Mr. Qualls, Mr. Barney, Mr. Meador, Mr. Wells and defendant Smith. At this meeting, it was discussed that defendant Smith would accompany Mr. Meador and Mr. Barney to Mexico to pick out a new landing site for smuggling another load of marijuana into the United States. On December 4, 1973, Mr. Qualls, Mr. Wells and defendants Smith and Phifer sent Roger Meador to Ensenada to pick up a second load of marijuana. Mr. Meador flew to Mexico in the Piper

Cherokee 140 but returned that evening empty because American and Mexican agents had been in the Ensenada area that day. The next day, December 5, 1973, Mr. Wells called Mr. Qualls and told him to meet him at Smith's house. When Mr. Qualls arrived at Smith's house, Mr. Wells and Mr. Meador were there and defendant Smith told them that the Cessna 421 aircraft had left for Philadelphia at 6:00 a.m. (PST) that morning with defendant Phifer and "Bruce" and the first load of marijuana. Mr. Meador was then taken to the airport to fly to Mexico to pick up the second load of marijuana. Mr. Qualls testified that to his own knowledge "Bruce" returned from the east on or about December 1, 1973 and that he had seen "Bruce" at Smith's house. Mr. Qualls identified "Bruce" as defendant Bruce Tallon. Mr. Qualls testified that throughout this period he had been in contact with Special DEA Agent Richard Sye and had relayed all this information to Agent Sye. Agent Sye testified that he received the information from Mr. Qualls that the Cessna 421 aircraft, loaded with marijuana, was en route to Philadelphia and was to land at Philadelphia International Airport. Agent Sye notified the Philadelphia DEA office of this information. On the morning of December 6, 1973, the Cessna 421 aircraft landed at Philadelphia International Airport, the occupants of the airplane, defendants Phifer and Tallon, and the airplane pilot, John Piazza, were arrested and twenty-one boxes of marijuana, with a total weight of about 240 pounds, were seized.

The pilot of the Cessna 421, Mr. Piazza, testified that he had several meetings in California with defendants Smith, Phifer and Tallon concerning the rental of the Cessna 421 for the purpose of flying boxes of cargo back to Philadelphia. The cost of the plane, the flying time, the weight of the cargo (150 pounds to 250 pounds) and the availability of the airplane were discussed. Mr. Piazza also testified that he and defendant Tallon arranged the boxes on the airplane prior to the flight to Philadelphia. Roger Meador also testified and his testimony corroborated that of Mr. Qualls with regard to their participation in this matter. The Court is satisfied that there was ample credible evidence in this case supporting the jury's verdict of guilty beyond a reasonable doubt. There was no miscarriage of justice. The motion for a new trial on this ground is denied.

■ In their motions for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, the defendants contend that the evidence was insufficient to sustain the convictions. In a motion for a judgment of acquittal, the pertinent question is "whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *Curley v. United States*, 81 U.S.App.D.C. 389, 160 F.2d 229, 232–33 (1947). It is not for the court, ruling on a motion for a judgment of acquittal, to assess the credibility of witnesses, weigh the evidence, or draw inferences of fact from the evidence. 2 *Wright & Miller, Federal Practice and Procedure: Criminal* § 467, at 259. Rather, the court must view the evidence in a light most favorable to the Government. *United States v. Pratt*, 429 F.2d 690 (3d Cir. 1970). If a conviction is based on circumstantial evidence, the evidence need not be inconsistent with every conclusion save that of guilty, provided it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt. *United States v. Giuliano*, 263 F.2d 582 (3d Cir. 1959). Applying these tests and viewing the evidence in a light most favorable to the Government, we conclude that there was ample sufficient evidence for the jury to find the defendants guilty beyond a reasonable doubt.

## 2. *The Airplane Search.*

The defendants seek a new trial on the ground that a cardboard box (Exhibit G–2) and marijuana (Exhibits G–7, G–8, G–9, G–10, G–11) seized from the airplane and introduced as evidence at the trial of this case were the products of a warrantless search in violation of their Fourth Amendment rights. The admission of this physical evidence was the subject of a 2-day suppression hearing held on May 22 and May 24, 1974. These motions were denied on June 11, 1974 and we thereupon proceeded with the trial of this case. The following are the reasons why the defendants' post-trial motions on this basis are denied.

Special Agent Richard Sye, a DEA agent for the Los Angeles area, was the principal government witness at the suppression hearing. According to Agent Sye, he had been receiving information from an individual (identified at trial as Melvin Qualls) since June 1973 regarding illegal drug activity which involved smuggling by aircraft from Mexico. Agent Sye detailed numerous incidents in which information obtained from Mr. Qualls directly resulted in the seizure of a stolen airplane utilized in the smuggling of marijuana from Mexico, the discovery of a "laboratory" utilized for the manufacture of methamphetamine and several arrests and drug seizures made in California. Agent Sye indicated that he never received unreliable information from Mr. Qualls regarding the criminal activities of other persons and that Mr. Qualls was most reliable.

With regard to the search and seizure which occurred on December 6, 1973 at Philadelphia International Airport, Agent Sye testified to the sequence of events leading to the arrest of the defendants Tallon and Phifer and the search of the airplane. He testified that on November 20, 1973, he received a phone call from Mr. Qualls who told him that a plan was developing between defendants Smith and Phifer and others to smuggle marijuana into the United States from Mexico using a private aircraft. On November 27, 1973, Agent Sye received a phone call from Qualls in which he advised Agent Sye that defendants Smith and Phifer had flown with him to Mexico in a Piper Cherokee airplane, that while in Mexico they had negotiated with a Jose Morales to set up a smuggling venture and that on November 26, 1973, the airplane returned to the United States. Agent Sye testified that he independently corroborated this information by an examination of the United States Custom Records of Entry and Exit. He further testified that Mr. Qualls advised him that the plan was to smuggle marijuana into the United States from Mexico and that the marijuana was to be stored in a building located at 1107–B Elm Avenue, Fullerton, California pending its shipment back to Philadelphia. This building was pointed out to Agent Sye by Mr. Qualls. Agent Sye ascertained that the portion of the building where the marijuana was to be stored had been rented by Bruce Tallon, using the name Robert Miller. Agent Sye testified that prior to the arrest and search of December 6, 1973, he and another DEA agent saw cardboard boxes in the building. On December 5, 1973, Agent Sye received information from Mr. Qualls that some of the boxes of marijuana were en route to Philadelphia in a Cessna 421 airplane, No. N421L; that the airplane was carrying about 200 pounds of marijuana in cardboard boxes; that the airplane was to land at Philadelphia International Airport; that the pilot's name was either John or Dave; and, that two other occupants named Tom and Bruce were aboard the airplane. Agent Sye testified that at about 2:30 p. m. (PST) that same day, after he received this information from Mr. Qualls, he called the DEA office in Philadelphia and spoke to Agent Dale Lear. Agent Sye gave Agent Lear all the background information he had received to that time regarding the smuggling operation and advised him that the marijuana had been stored in a building in Fullerton California; that the marijuana had been loaded aboard a 421 Cessna airplane, No.

N421L; that this airplane had departed California at about 6:00 a. m. (PST), December 5, 1973; that the marijuana was contained in cardboard boxes; that the pilot's name was either John or Dave; that the names of the other occupants were Tom and Bruce; that the plane was to land at Philadelphia International Airport; and that he acquired most of this information from a reliable informant.

Agent Roy Hawk of the Philadelphia office of DEA also testified. Agent Hawk testified that at about 5:30 p. m. (EST), on December 5, 1973, Agent Lear had received the above described information from Agent Sye of the Los Angeles office of DEA. Upon receipt of this information, Agent Hawk directed one of his agents to contact DEA in Los Angeles to verify that there was an Agent Sye working in that office and the verification was made. Agent Hawk testified that he alerted Assistant United States Attorney Thomas Bergstrom and contacted the Federal Aviation Agency (FAA) in Philadelphia, New York and Washington in an attempt to learn the whereabouts of the airplane. The FAA advised Agent Hawk that they had established no contact with this airplane in the Philadelphia area which included both New York and Washington. At approximately 7:00 p. m. (EST), Agent Hawk again communicated with FAA in Philadelphia and requested that they place a lookout notice for the Greater Philadelphia area for this particular airplane and that if the FAA came in contact with this airplane, it should notify DEA of the airplane's location and direction. At 11:00 p. m. (EST), Agent Hawk again contacted FAA and provided FAA with his home phone number and that of Agent Lear and requested that FAA contact them at their homes if it received any information concerning this aircraft.

At approximately 4:00 a. m. (EST) on December 6, 1973, Agent Lear received a phone call from the FAA tower in Philadelphia in which he was told that FAA was in radio contact with Cessna 421 No. N421L and that it would be landing at Philadelphia International Airport in approximately ten minutes. Agent Lear notified Agent Hawk who immediately contacted the Philadelphia Police stationed at the airport. Agent Hawk testified that he identified himself over the phone and told the officer to whom he was speaking that a Cessna 421, No. N421L airplane would be arriving in a few minutes at the airport; that no DEA agent was immediately available; and he requested the Philadelphia Police to meet the airplane when it landed, secure it and detain the occupants of that airplane until the DEA agents arrived. Agent Lear during this time contacted other DEA agents and had them proceed to the airport immediately. The stipulated testimony of several Philadelphia police officers stationed at the airport is that upon receiving Agent Hawk's request they ascertained the location of the airplane and immediately upon its landing at Philadelphia International Airport, drove to the airplane; that they met three passengers debarking from the airplane (identified as Thomas Phifer, Bruce Tallon and John Piazza); that they requested the passengers to come with them to the police station at the airport; that the pilot locked the airplane and put the key in his pocket; that one of the police officers remained with the airplane to guard it while the three passengers were escorted by the other police officers to the police station at the airport; that these three passengers remained in the police station at the airport until the DEA agents arrived a short time thereafter; and that the three passengers were being held in police custody until the arrival of the DEA agents.

Agents Hawk, Lear and Clements arrived at the airport at approximately 5:00 a. m. (EST). These agents proceeded directly to the police station located at the airport where the three passengers were seated together on a bench. Agent Hawk testified that after he had

a phone discussion with the Assistant United States Attorney, the three passengers, pilot John Piazza, defendant Thomas Phifer and defendant Bruce Tallon, were formally arrested, informed that they were under federal arrest, informed of the general nature of the charges and were read their *Miranda* warnings. Agent Hawk then ascertained that the plane was located on a ramp to the runways in the area of a hangar for private aircraft, about three city blocks from the police station. Agent Dennis Malloy of Philadelphia DEA testified that the DEA agents asked who had control of the airplane, who was in charge of it. Mr. Piazza responded that he was the pilot. Mr. Piazza was then asked if he had any objection to having the airplane searched and if he would be willing to sign a consent-to-search form. Mr. Piazza stated that he had no objection to the plane being searched and executed the consent-to-search form in the immediate presence of the defendants Phifer and Tallon. Agent Malloy testified that defendants Tallon and Phifer and Mr. Piazza were all in the same room and within two feet of each other when the discussion regarding the search of the airplane took place and when Mr. Piazza executed the consent-to-search form. Agent Malloy testified that neither Tallon nor Phifer made any statement whatsoever when the question was asked regarding who had control of the airplane, nor did they make any protest when Mr. Piazza executed the consent-to-search form. Agent Malloy testified further that defendant Tallon told him that he was just hitch-hiking a ride on the aircraft because he had personal business in Philadelphia and that defendant Phifer told him that he was flying into Philadelphia for personal business and that he was then going to Rhode Island to visit his parents. Thereafter, at about 5:30 a. m. (EST), several DEA agents proceeded along with the pilot, Mr. Piazza, who

had the key to the airplane, to the area where the airplane was located. Mr. Piazza unlocked the plane and Agent Hawk was the first person to enter the plane. Agent Hawk testified that, upon looking into the airplane with his flashlight after Mr. Piazza had unlocked the door, he saw about eight cardboard boxes, about 2½ feet long and 1½ feet wide, located toward the rear of the airplane, stacked on benches. Agent Hawk testified that he opened one of the boxes (Exhibit G–2) and saw several plastic bags containing what he believed to be marijuana (Exhibits G–7, G–8, G–9, G–10, G–11). The cardboard boxes were removed from the airplane and the boxes along with their contents were held as evidence. Agent Hawk testified that the search of the airplane was conducted without a warrant and that it was his understanding that at 5:30 a. m. (EST), a United States Magistrate was unavailable to him inasmuch as it was dawn and the United States Magistrate lived quite a distance from the airport.

The defendants contend that the warrantless search and seizure of the marijuana violated their Fourth Amendment rights against unreasonable search and seizure. Since no warrant had been issued for the search of the Cessna 421, No. N421L, the burden is upon the Government to demonstrate that the search in question fell within one of the exceptions to the warrant requirement of the Fourth Amendment. *United States v. Jeffers*, 342 U.S. 48, 72 S.Ct. 93, 96 L. Ed. 59 (1951). The Government's justifications for the warrantless search are: A. Probable cause with exigent circumstances; and B. Consent by the airplane pilot.[3]

A. *Probable Cause With Exigent Circumstances.*

The United States Supreme Court has frequently held that an automobile search, under certain circum-

3. The Government also contends that defendants Smith and Tallon have no standing to raise the issue of the legality of the search.

Because of the view we have taken herein, we need not discuss this issue.

stances, can be carried out without a warrant. *Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974); *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); see also *Schneckloth v. Bustamonte,* 412 U.S. 218, 228 n.10, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The rule for a warrantless automobile search may be stated as follows: A vehicle may be searched without a warrant provided there are exigent circumstances and there is probable cause to believe that the automobile will yield contraband or evidence useful for the prosecution of a crime. *Coolidge v. New Hampshire, supra; United States ex rel. Johnson v. Johnson,* 340 F.Supp. 1368 (E.D.Pa. 1972); Note, *Warrantless Searches and Seizures of Automobiles,* 87 Harv.L.Rev. 835 (1974). The Government asks that the Court apply this "automobile" exception to the facts of the instant case contending there exists both probable cause to search and exigent circumstances. The reasoning of the cases which employ this exception to the warrant requirement would appear to support its extension to airplanes since airplanes fit the general requirement of vehicles capable of removal which is the touchstone of these cases. *United States v. Ciovallo,* 384 F.Supp. 1385 (D.Mass.1974). Accordingly, we will treat the search of the airplane as equivalent to the search of an automobile.

The case of *Carroll v. United States, supra,* has spawned what is called the "automobile exception" to the warrant requirement of the Fourth Amendment. In *Carroll,* the issue was the admissibility into evidence of contraband liquor seized in a warrantless search of a car on the highway. After surveying the law from the time of the adoption of the Fourth Amendment onward, the Court held that automobiles and other conveyances may be searched without a warrant in circumstances that would not justify the search without a warrant of a house or an office. The Court expressed the underlying rationale of *Carroll* as follows:

We have made a somewhat extended reference to these statutes to show that the guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the government, as recognizing a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon, or automobile for contraband goods, where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.

\* \* \* \* \* \*

The measure of legality of such a seizure is, therefore, that the seizing officer shall have reasonable or probable cause for believing that the automobile which he stops and seizes has contraband liquor therein which is being illegally transported.

267 U.S. at 153, 155–56, 45 S.Ct. at 285.

In three later cases, *Husty v. United States,* 282 U.S. 694, 51 S.Ct. 240, 75 L.Ed. 629 (1931); *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) and *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), each involving an occupied automobile stopped on the open highway, the Court reaffirmed its decision in *Carroll.* As the Court stated in *Chambers v. Maroney, supra,* at page 51, 90 S.Ct. at page 1981, "exigent circumstances" justify the warrantless search of "an automobile stopped on the highway", where there is probable cause, because "the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must

be obtained." The Court in *Chambers* held that where the police may stop and search an automobile under *Carroll*, they may also seize it and search it later at the police station. Subsequent to *Chambers*, the Court decided the case of *Coolidge v. New Hampshire, supra,* distinguishing *Carroll* and *Chambers* on the facts, and holding that a warrant was required for the car search therein. The "result in *Coolidge* was merely the fruition of the warning in *Chambers* that exigent circumstances do not in every instance accompany the search of an automobile." *United States v. Kulp,* 365 F.Supp. 747, 755 (E.D.Pa.1973). We are of the opinion that the facts of this case are governed by *Carroll* and *Chambers* and not by *Coolidge.* The warrantless search in this case was not violative of the Fourth Amendment in that it meets the two requirements of "probable cause to search" and "exigent circumstances."

 Probable cause for a warrantless car search exists if there is "a belief reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction." *Carroll v. United States, supra,* 267 U.S. at 149, 45 S.Ct. at 284. We are of the opinion that the facts as set out above establish probable cause for the search in this case. We are satisfied that the detail information received from the informant establishes the requisite probable cause. *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *United States v. Moody,* 385 F.2d 531 (3d Cir. 1973); *United States v. McNally,* 473 F.2d 934 (3d Cir. 1973); *United States v. Kulp,* 365 F.Supp. 747 (E.D.Pa.1973). The first thing to note is that the events as they unfolded prior to the search bore out the informant in every respect. The informant told Agent Sye of the November 25, 1973 trip to Mexico for the pur-

pose of setting up the smuggling venture. The informant was on that trip and Agent Sye corroborated the fact of this trip through a check of Custom Records of Entry and Exit. That same informant told Agent Sye that the plan formulated was to smuggle marijuana from Mexico by plane and to store the marijuana in a building in Fullerton, California. The informant pointed the building out to Agent Sye and Agent Sye reported that he as well as another agent saw the cardboard boxes stored in this building. On December 5, 1973, the informant gave explicit detailed information to Agent Sye that the marijuana was en route back to Philadelphia on a private 421 Cessna airplane, No. N421L, that the airplane was to land at Philadelphia International Airport, that the pilot's name was either John or Dave and that the names of the other two occupants were Tom and Bruce. Prior to the search, all of this information was corroborated by the Philadelphia DEA agents in every respect. We believe that under the facts and circumstances of this case, there was probable cause and reasonable grounds to believe that the airplane contained contraband which by law was subject to seizure and destruction.

 Having found that there was probable cause to search, we must next decide if "exigent circumstances" existed for "no amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.'" *Coolidge v. New Hampshire,* 403 U.S. 443, 470, 91 S.Ct. 2022, 2039, 29 L.Ed.2d 564 (1971). In *Coolidge,* the Court found that while probable cause existed to search the defendant's automobile while it was parked in his driveway, the Court found that the requisite exigent circumstances did not exist to justify the warrantless search of the automobile. With regard to the situations constituting "exigent circumstances", *Coolidge* at pages 461–62, 91 S.Ct. at page 2035 is instructive:

The word "automobile" is not a talisman in whose presence the Fourth

Amendment fades away and disappears. And surely there is nothing in this case to invoke the meaning and purpose of the rule of *Carroll v. United States*—no alerted criminal bent on flight, no fleeting opportunity on' an open highway after a hazardous chase, no contraband or stolen goods or weapons, no confederates waiting to move the evidence, not even the inconvenience of a special police detail to guard the immobilized automobile.

The instant case provides several factors alluded to in *Coolidge* as constituting "exigent circumstances". The airplane had stopped on a landing pad of a public airport with access to runway ramps. The DEA agents had probable cause to believe that contraband was contained in the airplane. When the plane landed and the awaiting police cars were observable, confederates may very well have been alerted by way of the airplane radio to come and remove the airplane or the contraband. Similarly, the airplane contained 240 pounds of marijuana which obviously would have required some transportation from the airplane by automobile, or otherwise, perhaps by waiting confederates. Hence, we conclude that the warrantless search of the airplane at Philadelphia International Airport was lawful because the existence of probable cause to search was accompanied by "exigent circumstances". See *United States v. Moody*, 485 F.2d 531 (3d Cir. 1973) ; *United States v. Menke*, 468 F.2d 20 (3d Cir. 1972).

The defendants contend that the warrantless search of the airplane at Philadelphia International Airport was illegal because 80 minutes elapsed between the time the occupants debarked from the airplane, the airplane door was locked, and a single police officer was posted to guard the airplane, and the time the search was actually conducted. The defendants argue that even if the agents could have conducted a warrantless search when the airplane landed, once the defendants and the pilot and the airplane itself were seized and a guard

placed on the airplane, the Government is required to obtain a warrant because the exigencies no longer exist. Their contention is answered by *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). In *Chambers*, it was argued that when an arrest is made of occupants of an automobile on the open highway and the automobile and its occupants are taken into custody, the issue of probable cause to search the automobile should be submitted to a detached magistrate in the form of a request for a search warrant. In *Chambers*, the argument was made that the automobile was "immobile" and the occupants were in custody and, hence, all of the "exigent circumstances" no longer existed. The Supreme Court rejected this argument and held that when the initial intrusion is permissible under *Carroll*, i. e., when there is probable cause to search accompanied by "exigent circumstances" necessary to justify a warrantless search of the automobile on the highway, a subsequent search made at the stationhouse is also permissible. The Supreme Court observed:

> For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search [at the station house] without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

*Chambers v. Maroney, supra*, at 52, 90 S.Ct. at 1981. It appears that *Chambers* reasons that one's constitutional rights are protected if the probable cause and exigent circumstances existed at the time the vehicle was initially stopped and a warrantless search conducted later when the vehicle is in police custody is not illegal. We therefore conclude that the search and seizure of the marijuana in this case was lawful and reasonable under the Fourth Amendment and that the evidence obtained and introduced at trial was properly admitted.

B. *Consent to Search.*

The Government also contends that this warrantless search of the airplane was permissible since the pilot of the aircraft, Mr. Piazza consented to the search of the airplane. The testimony of Agent Malloy, discussed above, shows that after the defendants and Mr. Piazza had been placed under arrest and had been advised of their constitutional rights, the question was asked of the three occupants of the plane as to who had control of the airplane and who was in charge of it. At that time Mr. Piazza informed the DEA agents that he was the pilot of the aircraft and when asked if he had any objection to a search being made of the aircraft, he stated that he did not. Mr. Piazza was then asked if he was willing to sign a consent-to-search form. He stated that he was and then signed the form. Agent Malloy testified further that the defendants Tallon and Phifer were present when the question was asked as to who had control of the airplane, and who was in charge of it. Moreover, Agent Malloy testified that the defendants Tallon and Phifer made no statements regarding who had control of the airplane nor did either of them protest the pilot's right to sign the consent-to-search form, although they were within two feet of the pilot, Mr. Piazza, when these discussions regarding the search of the airplane took place and when Mr. Piazza executed the consent-to-search form. Defendant Phifer testified at the suppression hearing for the limited purpose of establishing that he had a proprietary interest in the airplane. Phifer testified that he had leased the airplane from its owner for $3,200.00 for the purpose of flying from California to Philadelphia and that he had full and complete control of the airplane and that he could instruct the pilot where he wanted to go and where he wanted to land. Phifer denied that he was present when Mr. Piazza executed the consent-to-search form. Phifer testified that the DEA agents entered the room where they were being held,

asked who the pilot was, Mr. Piazza responded, and then the agents took Mr. Piazza aside. Phifer testified that he was not informed that the airplane was to be searched, although he assumed that it would be, and that he made no protest or claim that he leased the airplane and that it was under his control. At the time of trial, Mr. Piazza, the pilot, testified that the airplane had been rented to defendant Phifer and that as the pilot he took his orders from defendant Phifer, provided the orders were within the scope of Federal Aviation Safety Regulations.

The Government contends that the search of the airplane was a permissible consensual search not requiring a search warrant. The issue now before us is whether the evidence presented by the Government with respect to the consent by Mr. Piazza, the pilot, to the search of the airplane was legally sufficient to render the seized materials admissible in evidence at the defendants' trial.

It is well settled under the Fourth Amendment that a search conducted without a warrant issued upon probable cause is *"per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L. Ed.2d 576 (1967); *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S. Ct. 2022, 29 L.Ed.2d 564 (1971); *Chambers v. Maroney,* 399 U.S. 42, 51, 90 S. Ct. 1975, 26 L.Ed.2d 419 (1970). It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent. *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). When consent is the alleged justification for a search, the burden is on the Government to demonstrate that it was "freely and voluntarily given" and not simply "acquiescence to a claim of lawful authority."

*Bumper v. North Carolina,* 391 U.S. 543, 549, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). Where a person is under arrest or in custody and consent to search is sought by police, the rule has emerged in this Circuit, *United States v. Menke,* 468 F.2d 20 (3d Cir. 1972); *United States ex rel. Harris v. Hendricks,* 423 F.2d 1096 (3d Cir. 1970); *Government of Virgin Islands v. Berne,* 412 F.2d 1055 (3d Cir. 1969), as well as others, *see e. g., United States v. Legato,* 480 F.2d 408 (5th Cir. 1973); *United States v. Cox,* 464 F.2d 937 (6th Cir. 1972); *United States v. Noa,* 443 F.2d 144 (9th Cir. 1971) that absent proof of actual coercion or intimidation such consent constitutes a valid waiver of Fourth Amendment rights if prior to the search, *Miranda* warnings are given.[4] Moreover, these cases are clear that the validity of this waiver is not affected by a failure to include in the *Miranda* warnings a specific reference that consent could be withheld.[5]

■ With these principles before us, we turn to the facts and circumstances surrounding the apprehension of the occupants of the airplane and the pilot's agreement to have the airplane searched. The occupants of the airplane, after they had been placed under arrest, were informed of the charges against them, were given their *Miranda* warnings, and were asked who controlled the airplane and who was in charge of it. Mr. Piazza responded that he was the pilot of the airplane and that he had no objection to the airplane being searched. The airplane was then unlocked by Mr. Piazza and it was searched. The defendant make no claim, nor is there any evidence of any intimidation, physical or psychological abuse, threats or coercion tending to show that Mr. Piazza's agreement to

have the airplane searched was not freely and voluntarily given. Moreover, there is nothing in the record to show that the DEA agents used any tactics that would augment the degree of coercion that is inherent in any arrest. In light of all the surrounding facts and circumstances, we are convinced that Mr. Piazza's consent was voluntary.

Our inquiry does not end here, however, for the defendants contend that Mr. Piazza had no authority to consent to the search of the airplane or its contents. Thus, the validity of the search in question insofar as the Government seeks to justify it on the basis of a third party's, i. e., Mr. Piazza's consent, turns on the right of the third party in this case to consent to the search of the airplane.

■ The right of a third party to consent to a search of jointly controlled premises has been judicially recognized in circumstances involving varied relationships between the consenting party and the party against whom evidence is discovered: spouses, *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *McCravy v. Moore,* 476 F.2d 281 (6th Cir. 1973); cohabitants, *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); mistresses and lovers, *United States v. Airdo,* 380 F.2d 103 (7th Cir. 1967); hosts and temporary house guests, *Pasterchik v. United States,* 400 F.2d 696 (9th Cir. 1968); trespasser and owner, *Government of Virgin Islands v. Gereau,* 502 F.2d 914 (3d Cir. 1974); roommates, *Wright v. United States,* 389 F.2d 996 (8th Cir. 1968); automobile bailors and bailees, *Anderson v. United States,* 399 F.2d 753 (10th Cir. 1968); parents and children, *United States v. Stone,* 401 F.2d 32 (7th Cir.

---

4. See *United States v. Horton,* 488 F.2d 374 (5th Cir. 1973), where the Court upheld a warrantless search authorized by consent of the defendant who had been taken into custody but not given *Miranda* warnings.

5. In *Schneckloth v. Bustamonte,* 412 U.S. 218, 240, n. 29, 93 S.Ct. 2041, 36 L.Ed.2d

854 (1973), the Supreme Court did not address itself to the standard to be applied in assessing the validity of a search authorized solely by an alleged consent that is obtained from a person after he had been placed in custody.

1968); business partners, *United States v. Sferas,* 210 F.2d 69 (7th Cir. 1954); and employee and employer, *United States v. Murphy,* 506 F.2d 529 (9th Cir. 1974); *United States v. Sells,* 496 F.2d 912 (7th Cir. 1974); *United States v. Grigsby,* 367 F.Supp. 900 (E.D.Ky. 1973). In its most recent pronouncement regarding the consent of a third-party to a search, the Supreme Court said that when the Government seeks to justify a warrantless search by showing voluntary consent, it may do so by showing that "permission to search was obtained from a third party who possessed common authority over and other sufficient relationship to the premises or effect sought to be inspected." *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). Citing *Matlock* and *Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), our Third Circuit in *Government of Virgin Islands v. Gereau, supra,* at 926, has stated:

> An owner or user of property can consent to search of that property, fruits of which may be admitted against another person, only if the relationship of each person to the property demonstrates that the non-consenting user assumed the risk that such consent might be given.

The third party's legal and possessory rights to the items or premises searched, his relationship to the subject of the search and the circumstances as they objectively appear to the searching officers at the time of the search are all to be considered in determining whether the third party possessed an independent right to consent to a warrantless search which will serve to permit the evidence obtained thereby to be used at trial. *United States v. Grigsby,* 367 F.Supp. 900, 902 (E.D.Ky.1973).

In the instant case, it is uncontroverted for Mr. Piazza was an employee of the lessee of the airplane, the defendant Phifer. At all times Mr. Piazza retained control of the airplane except to the extent that the lessee could direct Mr. Piazza where to go and where to land provided, of course, there was no violation of FAA regulations. When the occupants of the airplane were asked who had control of the airplane, Mr. Piazza responded in the immediate presence of the defendants that he was the pilot; he had the key to the airplane. Neither of the defendants interposed any objection or protest and stood idly by while Mr. Piazza stated that he had no objection to the airplane being searched and the defendants watched in silence while the pilot executed a consent-to-search form. Furthermore, Mr. Piazza held himself out in the presence of the defendants as the person who had control of the airplane and was in charge of it. Under all the facts and circumstances, Mr. Piazza could properly be viewed as being the one whom the searching officers could reasonably believe had the authority to consent to the search, since to the officers he had the necessary appearances of authority demanded by *Matlock* to give consent to search the airplane.

Therefore, for the reasons above stated, the search in this case was with consent freely and voluntarily given. This is an additional reason for this Court's finding that the search was lawful and reasonable under the Fourth Amendment and that the evidence obtained and introduced at trial was properly admitted. The defendants' motions for a new trial based upon their contention that the search was illegal and unreasonable are therefore denied.

### 3. *The Court's Sequestration Order.*

The defendants, Phifer and Smith, contend that in violation of the Court's Order of Sequestration of witnesses, the Government's witness, Melvin Qualls, the informant, during a recess in his cross-examination, conferred with the Government's case agent, DEA Agent Sye, and discussed with Agent Sye the date on which he had been paid by the Government. The defendants contend that this constituted a violation of the Court's Order of Sequestration thereby denying

the defendants the full effectiveness of cross-examination.

Prior to taking any testimony, the Court ordered sequestration of all witnesses, with the proviso that a witness would be permitted to remain in the courtroom after he testified. During the cross-examination of the informant, Melvin Qualls, he testified that between the end of the court session on July 16, 1974 and the resumption of his cross-examination on July 17, 1974, he had spoken with Agent Sye. He testified that he inquired of Agent Sye as to the date on which he had been paid $700 by Agent Sye for his help in the investigation. He further testified that he had no other conversation with Agent Sye concerning the case. The defendants moved for a mistrial claiming a violation of the Court's Order of Sequestration. This motion was denied. Upon denying the defendants' motion, the Court noted that there had been no request that Mr. Qualls be instructed not to discuss the case with anyone while on cross-examination.

Failure of a witness to comply with a sequestration order does not of itself render his testimony inadmissible, although it may affect the weight of his testimony. *United States v. Suarez,* 487 F.2d 236 (5th Cir. 1973). It is a general rule that the trial court may in its discretion exclude testimony of witnesses who violate a sequestration order if the defendant is prejudiced by the violation. *Holder v. United States,* 150 U.S. 91, 14 S.Ct. 10, 37 L.Ed. 1010 (1893); *United States v. McClain,* 469 F.2d 68 (3d Cir. 1972). "The primary purpose of sequestration is to assure, as nearly as can be, that witnesses will be separated so that the testimony of one witness or a discussion of it will not become a basis upon which the testimony of another witness will be founded or affected." *United States v. Harris,* 368 F.Supp. 697 (E.D.Pa.1973). In the instant case, the record shows that Mr. Qualls was given one bit of information by Agent Sye during Mr. Qualls' cross-examination. If indeed there was a violation of the Court's sequestration order it was technical only and was collateral and inconsequential in nature and its effect was not prejudicial. Defense counsel emphasized to the jury the discussion between Mr. Qualls and Agent Sye and adequately argued to the jury its effect on Mr. Qualls' credibility. We are unable to see where this Court abused its discretion in denying defendants' motion for a mistrial.

## 4. *Grand Jury Transcript.*

Defendant Smith contends that the Court erred in refusing his request for a copy of the transcript of Mr. Melvin Qualls' testimony before a grand jury in the United States District Court for the Southern District of California.

The day after the informant, Melvin Qualls, concluded his testimony, the Government attorney informed the Court that Melvin Qualls had testified before a grand jury of the United States District Court for the Southern District of California with regard to another transaction which occurred at the very end of December 1973, well after the transaction in this case. The Government attorney informed the Court that he had a transcript of Mr. Qualls' testimony before that grand jury and requested the Court to review the transcript *in camera* and make a decision as to whether or not the transcript was producible under the Jencks Act, 18 U.S.C. § 3500. It was the Government's position that the matter contained in Mr. Qualls' grand jury testimony did not relate to the subject matter of Mr. Qualls' testimony in the instant case.

The Court reviewed *in camera* the transcript of Mr. Qualls' grand jury testimony and concluded that it should not be turned over to the defendants. The Court reviewed the transcript and found that it no way, related to the subject matter as to which Melvin Qualls had testified in this case. The defendants contend that this constitutes prejudicial error.

██ Before a defendant is entitled to the delivery of a statement under the Jencks Act, 18 U.S.C. § 3500, the Government witness must have testified and the statement must relate to the subject matter of the testimony. The ruling as to whether the requested statement relates to the testimony given by the witness is left to the determination of the trial judge after an "inspection of the court in camera." 18 U.S.C. § 3500; *United States v. Scolnick*, 392 F.2d 320, 327 (3d Cir. 1968). This is the exact procedure followed here. This Court considered the Government's and defendants' contentions and made an *in camera* inspection of the grand jury testimony before making the ruling now complained of. This Court upon a review *in camera* of the grand jury transcript, and with careful and due regard to the defendants' rights, declined to order the Government to turn over the transcript on the basis of the Court's finding that the testimony of Mr. Qualls before the California grand jury did not relate to the subject matter of his testimony in this case.

5. *Defendant's Requested Points for Charge.*

Defendant Smith contends that the Court erred in failing to give his requested points for charge numbers 17, 18 and 19 which read:

17. In determining what weight you are to give to the testimony of witnesses that you might consider accomplices of the defendant, you may consider the prior criminal record of the accomplice witness.

18. The testimony of an accomplice must be examined with care and received cautiously.

19. Accomplice testimony should be regarded with suspicion.

██ A party who desires a particular instruction ordinarily must proffer that instruction and object to its omission. *United States v. Rothman*, 463 F. 2d 488 (2d Cir. 1972); *United States v.*

*Bailey*, 451 F.2d 181 (3d Cir. 1971); *United States v. Conversano*, 412 F.2d 1143 (3d Cir. 1969). The trial judge, in his discretion, may refuse to give a proffered instruction where his general instructions, viewed as a whole, adequately express the substance of the proffered instruction for which there is *Maenza*, 475 F.2d 251 (7th Cir. 1973); *United States v. Gremillion*, 464 F.2d 901 (5th Cir. 1972); *United States v. Bailey, supra; United States v. Conversano, supra.* A court need not give a proffered instruction for which there is no basis in the evidence. *United States v. Mack*, 151 U.S.App.D.C. 162, 466 F.2d 333 (1972); *United States v. McCann*, 465 F.2d 147 (5th Cir. 1972). The testimony in this case relating to the charges in the indictment shows Melvin Qualls' status as that of a Government informant, as distinct from an accomplice. To have referred to Mr. Qualls as an "accomplice" would have been misleading and confusing to the jury, because his role in this case from both the Government's strategy and evidence, as well as that of the defendants, was that he had been before and during the trial a paid Government informant. Accordingly, the Court charged the jury on the issue of Melvin Qualls' credibility on the basis of his status as an informant, charging nonetheless substantially the same as requested by the defendant. (See N.T. 6–85). We find no error in this regard. *United States v. Harris*, 368 F.Supp. 697 (E.D.Pa.1973).

6. *Proof of Marijuana as a Non-Narcotic Controlled Substance.*

██ Defendant Smith contends that the Government failed to prove beyond a reasonable doubt that marijuana is a non-narcotic controlled substance, as set forth in 18 U.S.C. § 841. There is no question in this case that the contraband seized from the airplane was marijuana. (N.T. 4–89 to 4–103).

The Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U. S.C. § 801 et seq. establishes a series of

five schedules of controlled substances and lists a number of criteria based upon which the various controlled substances were each assigned by Congress to one of the schedules. See 21 U.S.C. § 812.

The indictment in this case charges a violation of 21 U.S.C. § 841(a)(1) making it unlawful to manufacture, distribute, possess with intent to distribute, etc. "a controlled substance". The term "controlled substance" means a drug or other substance included in Schedule I, II, III, IV or V. 21 U.S.C. § 802(6). Congress has designated marijuana as a controlled substance and has listed it in Schedule I as such. 21 U.S.C. § 812(c)(c)(10). Congress has thus made the determination that, as a matter of law, marijuana is a controlled substance. Thus, the Government only has the burden of proving that the substance seized is, in fact, marijuana. The Court charged that the Government has the burden of proving beyond a reasonable doubt the substance seized and introduced into evidence was, in fact, marijuana. The Court instructed the jury that marijuana is a Schedule I controlled substance, as that term is used in 21 U.S.C. § 841. Accordingly, this contention of defendant Smith as grounds for a new trial or judgment of acquittal is without merit.

### 7. Government's Attempt to Elicit Fingerprint Evidence.

■ Defendant Smith contends that the "Government 'trapped', 'lured' and 'enticed' the defendant to object to the Government's attempt to elicit fingerprint evidence from an agent of the Drug Enforcement Agency who was not competent to testify about such fingerprint evidence, despite the fact that the Government had knowledge that there were in fact no fingerprints of the defendant on any of the alleged contraband."

During the direct examination of DEA Agent Dennis Malloy, Agent Malloy testified that he took three of the cardboard boxes seized from the airplane to the Philadelphia Police Crime Laboratory to have them examined for possible fingerprint evidence. The Government attorney then asked the following question: "Do you know of your own personal knowledge the results of the fingerprint analyses?". Counsel for defendant Smith objected and the Government attorney withdrew the question. We are at a loss to see what prejudice there may have been to defendant Smith from the asking of this question, which was not answered. We assume that the Government attorney acted conscientiously and with due regard to the defendants' rights in conducting the trial of this case and there is no basis in this record to conclude that his motives were improper in asking the above question. Moreover, considered in the light of all the evidence, this question by the Government attorney was not prejudicial. *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *United States v. Leftwich*, 461 F.2d 586 (3d Cir. 1972).

### 8. Admission of Hearsay.

■ Defendant Tallon contends that "Prejudicial conclusions and/or hearsay were admitted against the defendant, Bruce Tallon." However, he has failed to set forth any specifics with regard to the claim of error asserted, nor has he favored us with a supporting brief. We, therefore, assume that this ground has been abandoned by defendant Tallon. Notwithstanding the apparent abandonment of this ground, we have carefully reviewed the entire record and find it to be without merit.

Accordingly, the following Order is entered:

### ORDER

And now, to wit, this 24th day of June, 1975, it is hereby ordered that the Motions of Defendants, Thomas Phifer, Bruce Tallon and William Scott Smith, for a New Trial or, in the alternative, Judgment of Acquittal, are denied.