**UNITED STATES of America**

v.

**Rodney K. BEVANS.**

**Crim. No. 89–00340–01.**

United States District Court,
E.D. Pennsylvania.

Jan. 4, 1990.

Maureen Barden, Asst. U.S. Atty., Philadelphia, Pa., for plaintiff.

James A. Lammendola, Philadelphia, Pa., for defendant.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

Defendant Rodney Bevans was convicted of conspiracy to sell and willful possession of stolen mail matter in violation of 18 U.S.C. § 1708 and 18 U.S.C. § 371. Defendant now moves the Court to set aside the jury's verdict of guilty and enter a judgment of acquittal, or, in the alternative, to order a new trial. Fed.R.Crim.P. 29(c) & 33. The Court concludes that defendant's contentions are meritless and therefore denies his motions.

On a motion for judgment of acquittal, the Court must uphold a verdict of guilty if, viewing the evidence introduced at trial in the light most favorable to the Government, it ascertains that a reasonable jury could declare the defendant guilty of every element of the offenses charged beyond a reasonable doubt. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469,

86 L.Ed. 680 (1942); *United States v. Terselich*, 885 F.2d 1094, 1097 (3d Cir. 1989); *United States v. Ashfield*, 735 F.2d 101, 106 (3d Cir.), *cert. denied*, 469 U.S. 858, 105 S.Ct. 189, 83 L.Ed.2d 122 (1984). When reviewing a conviction for sufficiency of the evidence, the Court may not intrude into the province of the jury and evaluate the credibility of the witnesses. *United States v. Dixon*, 658 F.2d 181, 192 (3d Cir.1981). In contrast, the decision whether to grant a motion for a new trial on the ground that the verdict is contrary to the weight of the evidence is committed to the sound discretion of the trial court, which may set aside the verdict and order a new trial if it ascertains that the verdict constitutes a miscarriage of justice. *United States v. Martorano*, 596 F.Supp. 621, 624 (E.D.Pa.1984), *aff'd*, 767 F.2d 63 (3d Cir.), *cert. denied*, 474 U.S. 949, 106 S.Ct. 348, 88 L.Ed.2d 296 (1985); *United States v. Phifer*, 400 F.Supp. 719, 723 (E.D.Pa. 1975), *aff'd*, 532 F.2d 748 (3d Cir.1976). The Eighth Circuit has explained that when considering a motion for a new trial,

> [t]he district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses. If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.

*United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir.1980) (quoted with approval in *Tibbs v. Florida*, 457 U.S. 31, 38 n. 11, 102 S.Ct. 2211, 2216 n. 11, 72 L.Ed.2d 652 (1982)); *see also Phifer*, 400 F.Supp. at 722; 3 C. Wright, *Federal Practice and Procedure* § 553, at 245–48 (1982 & Supp.1989). The Court also must grant a new trial if there is a reasonable probability that error infecting the prior proceedings could have had a substantial influence on the jury's decision. *Government of Virgin Islands v. Bedford*, 671 F.2d 758, 762 (3d Cir.1982);

*United States v. Mastro*, 570 F.Supp. 1388, 1390 (E.D.Pa.1983).

The facts leading to the arrest and conviction of defendant Bevans may be summarized as follows. Joseph Patterson testified at trial that he encountered defendant, who was a postal employee, on a street in Philadelphia in June or July, 1989. Although Patterson and Bevans had socialized infrequently since the early 1970s, they had been close childhood friends. Bevans asked Patterson whether he could sell stolen checks for him. Patterson replied that he might be able to, but would have to let Bevans know. Some time afterward, Patterson sought out an acquaintance, James Jones, to arrange the transaction. Jones in turn contacted John Bolger, a Postal Inspector acting undercover, offered to sell him checks, and agreed to a meeting.

Patterson informed Bevans that the deal had been set in motion, and Bevans instructed him to come to his house to get the checks. Jones and Patterson drove to defendant's home in West Philadelphia. There, Bevans handed Patterson an open envelope containing five United States Treasury checks. Patterson inspected the envelope's contents, but did not look at the value of the checks. He and defendant discussed the percentage of the sale proceeds that defendant would receive.

On July 14, 1989, two or three days after Patterson procured the checks from defendant, James Mathews drove Patterson and Jones to the parking lot of a Howard Johnson's in Chester, Pennsylvania, to meet Inspector Bolger, as previously arranged. Bolger testified that for $730 Jones sold him the set of five checks, which had a total face value of $2,187.75. Although Bolger was aware of the presence of Mathews and Patterson at the buy, he had direct dealings with Jones only. On the return trip to Philadelphia, Jones and Patterson apportioned the proceeds from the sale. Afterward, Patterson went to defendant's home to deliver Bevans's share of the money. In conformance with Bevans's instructions, Patterson placed the cash in an envelope and slipped it under the front door.

The second transaction was consummated in substantially the same manner as the first. Patterson called on defendant at home. Because Linda Fisher, a neighbor of defendant's, was visiting, Bevans and Patterson retired to the kitchen. There, along with some envelopes, defendant handed Patterson three stolen Treasury checks and one stolen commercial check with a combined face value of $1,186.25. Patterson and Bevans together carefully reviewed the checks and their amounts before Patterson left. The following day, Mathews drove Patterson and Jones to a pre-arranged location near the Philadelphia Airport, and Jones sold the checks to Inspector Bolger for $400. Patterson left Bevans's share at his house as he had before.

The third sale occurred on August 3, 1989. Bevans previously had given Patterson two stolen commercial checks worth $587.69. Patterson and Jones again met with Bolger and offered to sell him the checks, but this time they were arrested. After initially denying involvement in any illegal activity, Patterson finally admitted participation in the scheme and agreed to cooperate with the Postal Inspectors' investigation.

On the following morning, Patterson, who had spent the prior night at home, returned to the fourth floor of the Post Office at 30th Street. After Patterson consented to have the conversation electronically recorded, he spoke to defendant on a telephone to which agents had attached a tape machine. Patterson first told Bevans that he had his money. When Patterson asked Bevans whether he had any more checks, Bevans indicated that he did not. Patterson also stated that he was on his way to deliver the money, to which defendant replied, "Yeah." An agent for the Post Office then drove Patterson to defendant's home and instructed Patterson to hand Bevans a sealed white envelope containing $75 in cash. Patterson entered defendant's house and gave him the envelope. Bevans placed the unopened envelope inside a cookie jar in the kitchen, where it stayed until after defendant was arrested.

## I. Weight and Sufficiency of the Evidence

In the present case, viewed under the standards of either Rule 29 or Rule 33, the evidence was sufficient to justify the jury's finding of guilt as to each element of the offenses for which Bevans was charged. The Court initially turns to defendant's conviction for possession of stolen mail matter pursuant to 18 U.S.C. § 1708. Count Two of the indictment alleged that Bevans illegally possessed two United States Treasury checks worth $987.00 which had been abstracted from the mail. Count Four charged defendant with unlawful possession of a Pennsylvania Central Tax Bureau check that also had been stolen from the United States mail. To establish a violation of 18 U.S.C. § 1708, the Government must prove: (1) the item specified in the indictment had been stolen from the mail, (2) the defendant unlawfully possessed the item, (3) the defendant knew the item was stolen, and (4) the defendant had the specific intent to possess the item unlawfully. *United States v. Hall*, 845 F.2d 1281, 1284 (5th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 155, 102 L.Ed.2d 126 (1988); *United States v. Osunegbu*, 822 F.2d 472, 475 (5th Cir.1987).

The Government clearly has met these requisites. It was not contradicted at trial that the three checks had been introduced into the mail, that they failed to reach the parties to whom the checks were addressed, and that the payees did not authorize any party to cash the checks. Nor did Bevans dispute that the normal course of postal operations would have taken the three checks through the 30th Street Station in Philadelphia, where defendant worked, and defendant's supervisor at the Post Office testified that Bevans's usual duties as a handler in the break-up areas of the station afforded him regular access to mail. Inspector Bolger stated that he purchased the three relevant checks from Jones and Patterson. Patterson, a co-defendant who had pled guilty to selling stolen United States Treasury checks in violation of 18 U.S.C. § 510(b) and conspiring to sell checks stolen from the mail in violation of 18 U.S.C. § 371, in turn testified that he

had received from defendant Bevans the checks which he and Jones sold to Inspector Bolger. A Government expert identified Bevans's latent fingerprints on the checks and on an envelope that contained five checks which Jones and Patterson had sold to Inspector Bolger. Indeed, Bevans himself admitted that he had come into contact with the checks and that he knew that they were stolen. Patterson further testified that before the first sale he and Bevans had discussed the percentage share which Bevans would receive and that prior to the second sale they methodically inspected the checks which defendant had given to Patterson. As such, the evidence showed that Bevans specifically intended to and did possess the stolen items unlawfully.

■ Bevans also challenges the jury's conclusion that he conspired to possess and sell checks stolen from the mail in contravention of 18 U.S.C. § 371. To establish a conspiracy under section 371, the Government must prove: (1) a combination of two or more persons, (2) an actual agreement, whether express or tacit, between those persons, (3) an unlawful purpose, and (4) an overt act by one of the conspirators. *United States v. Uzzolino*, 651 F.2d 207, 214 n. 13 (3d Cir.), *cert. denied*, 454 U.S. 865, 102 S.Ct. 327, 70 L.Ed.2d 166 (1981); *United States v. Small*, 472 F.2d 818, 819 (3d Cir.1972), *cert. denied sub nom. Frezzo v. United States*, 469 U.S. 979, 105 S.Ct. 380, 83 L.Ed.2d 315 (1984). These elements may be established in whole or in part by circumstantial evidence. *United States v. Wexler*, 838 F.2d 88, 90 (3d Cir.1988).

■ At bottom, defendant does not contest that the underlying conspiracy existed or that the overt acts were performed as charged in the indictment. He claims instead that the Government did not prove that he knowingly participated in the illegal scheme. Before a court can sustain a conspiracy conviction, of course, there must be evidence tending to show that "defendant entered into an agreement and knew that the agreement had the specific unlawful purpose charged in the indictment." *Id.* at 91 (quoting *United States v. Scanzello*, 832

F.2d 18, 20 (3d Cir.1987)); *see also United States v. Cooper*, 567 F.2d 252, 253 (3d Cir.1977). The inferences arising from merely "'keeping bad company' are not enough to convict a defendant of conspiracy." *Wexler*, 838 F.2d at 91.

Standing alone, Patterson's testimony itself supplied ample proof that defendant had knowledge of the illegal objective contemplated by the conspiracy. Patterson stated that Bevans specifically elicited his assistance in passing checks, that defendant handed checks over to Patterson on three different occasions with the understanding that Patterson would sell them, that none of the checks bore either defendant's or Patterson's name, that he and defendant agreed to share the sale proceeds, that on at least one occasion defendant and Patterson together carefully reviewed the set of checks to be sold, and that Patterson, as defendant had instructed, delivered to Bevans envelopes containing cash at the conclusion of each transaction.

Independent evidence introduced at trial also supported the verdict. Bevans's fingerprints were discovered on three of the stolen checks and on a white envelope in which Inspector Bolger received the first five checks he purchased from Jones and Patterson on July 14, 1989. Further, during the telephone conversation tape recorded by investigators on August 4th, when Patterson told Bevans that he had his money, Bevans responded, "You do?.... Where you at?" After explaining that he was at his sister's, Patterson asked defendant whether he had any more checks to pass. Bevans replied in the negative. Patterson indicated that he would be right over to drop off the money, to which Bevans stated, "Yeah." Shortly afterward, a Postal Inspector drove Patterson to defendant's home, where Bevans accepted from Patterson an envelope containing cash. These circumstances, taken together, indicate beyond doubt that Bevans knowingly combined with Patterson and Jones for the very purpose of selling stolen Treasury checks and other mail matter in violation of federal law.

The Court further finds that the verdict was neither contrary to the weight of the evidence submitted at trial nor an affront to justice. In support of his motion for a new trial, defendant primarily argues that Patterson was not worthy of belief because he was under the influence of illegal drugs at the time the transactions with defendant occurred and because he had ingested methadone prior to testifying at trial. The Court, however, perceived Patterson's testimony to be frank, credible, and consistent on material matters. Further, at virtually every point his testimony coalesced with the physical evidence, including an incriminating tape-recorded conversation between defendant and Patterson, and the statements of other Government witnesses.

■ The Court understands defendant to assert only that Patterson was not a credible witness. To the extent he claims in his brief that Patterson was incompetent to testify because of his methadone use, we first note that this objection was not raised at trial and therefore had been waived. *See generally United States v. Banks*, 520 F.2d 627, 630 (7th Cir.1975); 2 J. Wigmore, *Evidence* §§ 486, 586 (Chadbourn rev. 1979 & Supp.1989). After Patterson freely admitted on the stand that he had taken methadone, the obvious recourse afforded defendant was to seek a voir dire hearing to challenge Patterson's mental capacity if he intended to do so. For defendant now to argue Patterson was not competent is mere conjecture. If drug use "does not *per se* render a defendant incompetent to stand trial," *Reed v. United States*, 529 F.2d 1239, 1241 (5th Cir.) (quoting *United States v. Williams*, 468 F.2d 819, 820 (5th Cir.1972)), *cert. denied*, 429 U.S. 887, 97 S.Ct. 241, 50 L.Ed.2d 169 (1976), necessarily vitiate a party's consent to have telephone calls electronically recorded, *see United States v. Kelly*, 708 F.2d 121, 125–26 (3d Cir.), *cert. denied*, 464 U.S. 916, 104 S.Ct. 279, 78 L.Ed.2d 258 (1983); *id.* at 127 (Gibbons, J., dissenting), or prohibit an individual from entering a valid guilty plea, *Williams v. United States*, 500 F.2d 42, 44 (10th Cir.1974), it follows that it does not inherently reduce a witness to incompetency. *See United States v. Garner*, 581 F.2d 481, 485 (5th Cir.1978); *United States v. Jackson*, 576 F.2d 46, 48 (5th Cir.1978). Moreover, whether and to what degree a person experiences narcotic effects from methadone depends, among other factors, on the method by which it is introduced into the body, the length of time that the patient has taken the drug, the dosage, and the regularity of ingestion. *United States v. Moore*, 423 U.S. 122, 125, 96 S.Ct. 335, 337–38, 46 L.Ed.2d 333 (1975); *Beazer v. New York City Transit Auth.*, 399 F.Supp. 1032, 1038–39 (S.D.N.Y.1975), *modified*, 558 F.2d 97 (2d Cir.1977), *rev'd on other grounds*, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979). In consequence, given that Bevans had an opportunity to inquire into the witness's capacity, he "should not be allowed to speculate by letting error go unremarked while then seeking a new trial on the basis of an unfavorable verdict." *United States v. Small*, 891 F.2d 53, 56 (3d Cir.1989) (quoting *United States v. Friedland*, 660 F.2d 919, 928 n. 9 (3d Cir.1981), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2268, 73 L.Ed.2d 1283 (1982)). This principle is particularly apposite when the supposed irregularity in the Government's case could have been cured easily during the proceedings, but now could be rectified only by a new trial. If the Court had found that Patterson was incompetent to testify, because the alleged infirmity was the product of an intoxicant, the effects of which are likely temporary, the Government simply could have presented Patterson at a later time when—or sought a continuance until—he was no longer laboring under the grip of methadone.

■ Even apart from defendant's lack of right to assert the argument, the Court, on the basis of the record and having observed Patterson during his extensive testimony at trial, *see Banks*, 520 F.2d at 630, cannot agree that he was incompetent to testify. Patterson was responsive to questioning by counsel, answered in a lucid and cogent manner, often affirmatively refused to accept defense counsel's characterizations on cross-examination, correctly related to the jury the details of his plea agreement with the Government, and ap-

peared to be fully cognizant of the nature of the proceedings. This case thus falls far short of presenting circumstances warranting disqualification under the Federal Rules of Evidence, which largely convert issues of competency into ones of credibility. *See* Fed.R.Evid. 601 advisory committee's notes ("Standards of mental capacity have proved elusive in actual application. A leading commentator observes that few witnesses are disqualified on that ground. Discretion is regularly exercise in favor of allowing the testimony. A witness wholly without capacity is difficult to imagine. The question is one particularly suited to the jury as one of weight and credibility, subject to judicial authority to review the sufficiency of the evidence." (citation omitted)); *see also Garner*, 581 F.2d at 485; *Jackson*, 576 F.2d at 48.

## II. Jury Instruction Regarding Narcotics Addiction

■ During his testimony, Patterson candidly acknowledged his history of extensive drug consumption. Defense counsel inquired repeatedly into the subject on cross-examination and stressed in both his opening and closing statements that Patterson was an admitted drug addict and had testified while on methadone. Defendant also requested the following instruction be delivered by the Court:

> If an informer is also a narcotics addict, there are additional reasons why his testimony should be considered with great care. An addict has a constant need for a supply of drugs and for money to support his habit, and also may have abnormal fear of imprisonment in which his supply of drugs might be cut off. These are special circumstances which you may consider in weighing testimony of this kind. You of course may give the testimony such weight as you think proper, after considering all relevant circumstances.

Defendant's Requested Points for Charge, Instruction No. 10 (citing 1 E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* § 17.03, at 527–28 (1977 & Supp. 1989)). The Court refused to adopt the proffered instruction as stated, largely on the ground that because Patterson was not an informer, but rather a co-defendant who had pled guilty, it was not applicable. *See United States v. Solimine*, 536 F.2d 703, 709 (6th Cir.), *vacated*, 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976), *on remand*, 551 F.2d 124 (6th Cir.1977). *Compare* 1 E. Devitt & C. Blackmar, *supra*, § 17.02, at 524 (testimony of informer) (defining informer as one "who provides evidence against a defendant for pay, or for immunity from punishment, or for personal advantage or vindication") *with id.* § 17.06, at 531–32 (testimony of accomplice) (defining accomplice as one "who unites with another person in the commission of a crime, voluntarily and with common intent").

After instructing members of the jury that the uncorroborated testimony of an ostensible accomplice should be viewed with "caution" and "great care," the Court stated that "because Mr. Patterson told you he was a drug addict, you can take into consideration the fact that he is an admitted drug addict in weighing his testimony as to whether it is believable or unbelievable." The Court further indicated that in assessing Patterson's credibility the jury could take into account that he had entered into a plea agreement with the Government and that he had been convicted previously on weapons and theft charges.

Defendant contended at oral argument on the post-trial motions and in his brief that the Court should have instructed the jury that the statements of a drug addict must be approached with "caution" or "great care," or alternatively that a drug addict is "inherently a perjurer." Not only did defendant fail to request at trial that the latter instruction be delivered, the Third Circuit squarely rejected the necessity of administering it in *Government of Virgin Islands v. Hendricks*, 476 F.2d 776, 779 (3d Cir.1973). *See also United States v. Gregorio*, 497 F.2d 1253, 1261–63 (4th Cir.), *cert. denied*, 419 U.S. 1024, 95 S.Ct. 501, 42 L.Ed.2d 298 (1974).

Numerous appellate panels similarly have declined to mandate juries be admonished to regard drug addict testimony with

"great care." *See, e.g., United States v. Kohrs,* No. 81–1538, slip op. (6th Cir. Apr. 29, 1983) (text available on LEXIS; summary disposition published at 709 F.2d 1510); *United States v. Bernard,* 625 F.2d 854, 860 (9th Cir.1980); *United States v. Tousant,* 619 F.2d 810, 812 (9th Cir.1980); *United States v. Collins,* 472 F.2d 1017, 1019 (5th Cir.1972), *cert. denied,* 411 U.S. 983, 93 S.Ct. 2278, 36 L.Ed.2d 960 (1973). Several factors indicate that there was no particularized need to charge the jury that it should approach Patterson's testimony with "caution" or "great care" because he was a drug addict, and, as such, the failure to do so could cause no prejudice. The instruction as a whole warned the jury that there were multiple reasons to view Patterson's credibility as suspect, including the fact that he was an abuser of narcotics, and indeed the Court utilized the specific words "caution" and "great care" in connection with its accomplice testimony instruction, which was delivered just prior to the drug addict testimony instruction. *See Hendricks,* 476 F.2d at 779 ("More-over, the district court did instruct the jury that because [the witness] was an informer his testimony had to 'be scrutinized with care and received with caution.'"); *see also United States v. Urian,* 858 F.2d 124, 127 n. 2 (3d Cir.1988) ("Urian also contends that the district court erred when it refused to determine the credibility of a drug addict's testimony. We find that this argument also lacks merit, ... [partly] because the judge's instruction did advise the jury to carefully assess the credibility of these government witnesses."); *United States v. Broyles,* 764 F.2d 525, 527 (8th Cir.1985); *United States v. Shigemura,* 682 F.2d 699, 701–03 (8th Cir.1982), *cert. denied,* 459 U.S. 1111, 103 S.Ct. 741, 74 L.Ed.2d 962 (1983); *United States v. Smith,* 692 F.2d 658, 660–61 (10th Cir.1982), *cert. denied,* 459 U.S. 1200, 103 S.Ct. 1183, 75 L.Ed.2d 431 (1983). Defense counsel also repeatedly elicited admissions from Patterson concerning his narcotics addiction on cross-examination, periodically referred to him as a junkie, and argued to the jury that Patterson was not to be believed because he used heroin, cocaine, and methadone. *See United States*

*v. Ochoa–Sanchez,* 676 F.2d 1283, 1289 (9th Cir.), *cert. denied,* 459 U.S. 911, 103 S.Ct. 219, 74 L.Ed.2d 174 (1982); *Hendricks,* 476 F.2d at 779; *United States v. Hoppe,* 645 F.2d 630, 633 (8th Cir.), *cert. denied,* 454 U.S. 849, 102 S.Ct. 170, 70 L.Ed.2d 138 (1981). Last, Patterson's testimony was corroborated by means of fingerprint analysis, surveillance, and the testimony of other witnesses. *See Hoppe,* 645 F.2d at 633; *Tousant,* 619 F.2d at 812; *Gregorio,* 497 F.2d at 1263.

## III. Evidentiary Rulings

■ Defendant urges the verdict be aside on three evidentiary grounds. He first contends that the Government's utilization of a United States military citation which Bevans received in Korea for filing a false customs declaration was improper under Federal Rule of Evidence 404(b), which allows the admission of other crimes or acts to prove mental state. The short answer to this claim is that the Government did not offer any evidence against Bevans pursuant to Rule 404. Rather, the Government cross-examined defendant about a prior false statement to illustrate his character for untruthfulness under Rule 608(b), and defendant raises no grounds to explain why he believes this was improper. Even assuming for argument's sake that the inquiry constituted error, the likelihood of prejudice emanating from the Government's conduct certainly was small. There was no mention of the customs declaration during the prosecution's presentation of its case-in-chief, Bevans denied that he had made a deceptive statement, and no extrinsic documentation of the incident was submitted to the jury.

■ Defendant also challenges the introduction of a tape-recorded conversation, the substance of which was related previously, between Patterson and Bevans following the former's arrest. The crux of Bevans's argument is that because the Government did not produce Patterson at the in limine suppression hearing convened to determine the tape recording's admissibility, it failed as a matter of law to sustain its burden of proving that Patterson's con-

sent was bestowed voluntarily. *See generally United States v. Starks*, 515 F.2d 112, 121 n. 11 (mandating voluntariness as part of foundation). Defendant cites no authority in support of this proposition, and the Court concludes it is unwarranted under existing law.

■ Whether a person's consent to the recording of a telephone conversation is voluntarily conferred or instead the product of a will overborne by duress or coercion is a question of fact to be ascertained from all the circumstances. *Kelly*, 708 F.2d at 125; *see Schneckloth v. Bustamonte*, 412 U.S. 218, 249, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973); *United States v. Sebetich*, 776 F.2d 412, 424 (3d Cir.1985), *cert. denied*, 484 U.S. 1017, 108 S.Ct. 725, 98 L.Ed.2d 673 (1988). This test in no way entails an unyielding requirement that the person who allegedly consented to police intrusion testify. As Judge Friendly stated in *United States v. Bonanno*, 487 F.2d 654, 659 (2d Cir.1973), to prove the voluntariness of consent, there simply "is no rule requiring the production of the best witness."

Evidence introduced at the suppression hearing clearly showed Patterson "consciously, freely, and independently" agreed to the recording, *see Kelly*, 708 F.2d at 125, and the Court so found. First, Patterson is thirty-nine years old, a high school graduate, *see United States v. Mendenhall*, 446 U.S. 544, 558, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980), and no novice in "dealing with law enforcement officials." *United States v. Stanley*, 597 F.2d 866, 869 (4th Cir.1979). Second, at the beginning of the tape itself Postal Inspector Roberts asked Patterson if the agents had his consent. Patterson replied that they did. At the trial, Patterson stated that he in fact agreed to have the call recorded and that he provided the agents with Bevans's telephone number. Counsel for the defense did not pursue the issue on cross-examination. Third, Inspector Parker testified at the hearing that no one involved in the investigation made promises or threats to Patterson in connection with the phone call, or otherwise applied any form of coercion

to obtain Patterson's cooperation. *See Schneckloth*, 412 U.S. at 228, 93 S.Ct. at 2048; *United States v. Osser*, 483 F.2d 727, 730 (3d Cir.), *cert. denied*, 414 U.S. 1028, 94 S.Ct. 457, 38 L.Ed.2d 321 (1973). Fourth, Patterson not only agreed to allow the Postal Inspectors to record the call just before it was placed on August 4th, but also stated during the course of the prior evening that he would permit it. Moreover, Patterson spent that intervening night at home. Last, despite defendant's speculative assertions to the contrary, there was no evidence that Patterson's drug usage so impaired his judgment that it "prevented him in any way from consciously and independently reaching his decision." *Kelly*, 708 F.2d at 126. Inspector Parker testified that Patterson did not appear to be under the influence of narcotics either time that he gave his consent. Inspector Stofer likewise stated that Patterson appeared sober when he drove Patterson to Bevans's house on August 4th, soon after the phone call.

■ Bevans next contends that his arrest by Postal Inspectors on August 4th was effectuated without probable cause, and, as such, the Court erred in denying at the suppression hearing his motion to exclude the evidentiary fruits of that detention, namely his fingerprints and certain exculpatory statements with which the Government confronted him on cross-examination. *See generally Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *cf. Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (holding illegally procured evidence may be introduced against defendant for impeachment purposes); *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952) (holding constitutionally infirm arrest does by its own force render conviction invalid). The fourth amendment permits authorities to "seize" a free citizen only upon probable cause, *Mendenhall*, 446 U.S. at 552–57, 100 S.Ct. at 1876–78; *United States v. Watson*, 423 U.S. 411, 417, 96 S.Ct. 820, 824–25, 46 L.Ed.2d 598 (1976), which arises when an individual of reasonable prudence could conclude, under all the available circumstances, that the person to

be arrested has committed an offense. *Henry v. United States,* 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959); *Carroll v. United States,* 267 U.S. 132, 161–62, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925).

As was adduced at the in limine hearing, however, postal agents patently were justified in arresting Bevans on August 4th. First, apparently because the checks purchased by Inspector Bolger were accompanied by envelopes normally associated with the mails, investigators suspected early on that a postal employee was the source of the checks. Second, the day before Bevans's detention, James Mathews related to Inspectors that Patterson "had a brother named Rodney" who worked for the postal service. Upon examining employee files, investigators ascertained that only one individual named Rodney worked for the Post Office in the area. They secured Bevans's photographic identification card and showed it to Mathews, who indicated that Bevans was indeed Patterson's "brother." Third, Patterson admitted during his interview on August 3d that defendant was the source of the checks. Last, the contents of the tape-recorded telephone call to Bevans and his acceptance of the check proceeds indicated that defendant had been involved in illegal activity. These circumstances provided the agents with the necessary probable cause to detain Bevans on August 4th for questioning and to take his fingerprints.

■ Finally, defendant argues that the Court should have suppressed the envelope which Patterson delivered to Bevans on August 4th at the instigation of Postal Inspectors. According to Bevans, his grant of consent to search his home—which yielded the item—was coerced because investigators had indicated that if defendant withheld permission to recover the envelope, they would attempt to secure consent from his mother, who also resided in the house. Although it was the Court's impression during the suppression hearing that Bevans had consented only to turn the envelope over to the inspectors and that no "search" occurred, the Government and de-

fendant both, without analysis, label the event as a "search," and the record is too sparse on the issue for the Court properly to evaluate whether that conclusory denomination adopted by the parties is a correct one. But, even assuming that investigators secured the envelope by means of a search within the meaning of the fourth amendment, the Court cannot agree that Bevans's consent was not voluntary.

In *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the Supreme Court reiterated the rule that the search of property, even absent a warrant and without probable consent, undertaken pursuant to consent voluntarily granted is permissible under the fourth amendment. *See also United States v. Matlock,* 415 U.S. 164, 165, 94 S.Ct. 988, 990, 39 L.Ed.2d 242 (1974). As indicated earlier, whether a person's consent is voluntarily conferred or instead the product of a will overborne by duress or coercion "is a question of fact to be determined from all the circumstances." *Schneckloth,* 412 U.S. at 249, 93 S.Ct. at 2059; *see also Sebetich,* 776 F.2d at 424. Pertinent to this inquiry are the consenting party's age, level of education, and intelligence, the lack of advice concerning the accused's constitutional rights, knowledge of the right to refuse to tender consent, and the nature of the physical surroundings. *Mendenhall,* 446 U.S. at 558–59, 100 S.Ct. at 1879–80; *Schneckloth,* 412 U.S. at 248, 93 S.Ct. at 2058; *Harless v. Turner,* 456 F.2d 1337, 1339 (10th Cir. 1972).

The circumstances in this case militate in favor of the conclusion that Bevans acted voluntarily and freely when he permitted the search of his home. First, the Court notes that Bevans is an educated adult male in his late thirties who served in the United States Army for seventeen years. His intelligence and sophistication are evidenced by his attainment of the rank of Sergeant, a position which involved substantial responsibility as a communication specialist. *See Schneckloth,* 412 U.S. at 248, 93 S.Ct. at 2058; *United States v. Wellins,* 654 F.2d 550, 555 (9th Cir.1981). Second, Bevans had been detained only a brief time when he agreed to the search.

Third, postal agents had administered to Bevans the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before he acquiesced. *See United States v. Kimball*, 741 F.2d 471, 474 (1st Cir.1984).

Last, investigators did not coerce defendant into permitting the search. Although courts have discussed little the ramifications of an official's articulated intention to seek another's consent upon the will of the ostensibly consenting party, several cases address the parallel issue of whether police claims that they will seek or obtain a search warrant if cooperation is not forthcoming vitiate a person's consent to search. Because those decisions also ultimately focus on the question of voluntariness, they provide helpful and perhaps controlling guidance.

Defendant does not assert that the atmosphere in which he was interviewed was menacing or that officials directed promises or threats toward him. Rather, he invokes only one factor that plausibly suggests involuntariness, namely, the agent's statement that authorities would approach his mother for her consent if defendant refused to allow the search. The investigator, however, did not indicate that they would obtain, as opposed to seek, her cooperation. *See United States v. Faruolo*, 506 F.2d 490 (2d Cir.1974). Because Bevans obviously was aware that his mother legitimately could refuse the request, for he himself initially withheld his own consent, the agent could not have conveyed the impression to Bevans that he "had no choice but to consent," *Sebetich*, 776 F.2d at 425, or that a search was otherwise a foregone conclusion. *See Bumper v. North Carolina*, 391 U.S. 543, 550, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). Moreover, the representation did not "constitute deceit or trickery, but only 'a fair and sensible appraisal of the realities'" facing Bevans. *Sebetich*, 776 F.2d at 425 (quoting *Faruolo*, 506 F.2d at 495). Not only is there no question that Bevans's mother possessed the authority to authorize the proposed search, *Matlock*, 415 U.S. at 170–71 & n. 7, 94 S.Ct. at 993 & n. 7; *United States v. Wright*, 564 F.2d 785, 790 (8th Cir.1977), it further appears that under *Matlock* "the prior refusal of the absent occupant to give consent would not present a bar to the police seeking consent from a co-occupant." 3 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 8.2(c), at 188–89 (2d ed. 1987 & Supp.1990).

In any event, the Court finds that the failure to suppress the envelope could not have had any prejudicial effect on defendant. Even if the Court had excluded from trial the envelope as physical evidence, neither Patterson nor the postal inspector who accompanied him to Bevans's home on August 4th would have been precluded from testifying that Bevans's had accepted it. Indeed, Bevans's admission on the witness stand that Patterson did deliver the envelope to him, and his post-arrest statement, which could have been introduced at trial on cross-examination had he claimed to the contrary, further demonstrate that the envelope itself was merely cumulative evidence concerning an uncontested matter.

An appropriate order follows.

## ORDER

AND NOW, this 4th day of January, 1990, upon consideration of Defendant Rodney Bevans's Motion for Judgment of Acquittal and Motion for New Trial, for the reasons stated in the Court's Memorandum of January 4, 1990,

IT IS ORDERED that Defendant's Motion for Judgment of Acquittal and Motion for New Trial are DENIED.