UNITED STATES of America

v.

Jerry POLIN.

Crim. No. 91–591.

E.D. Pennsylvania.

June 16, 1993.

Michael J. Holston, Asst. U.S. Atty., Philadelphia, PA, for plaintiff.

Robert E. Madden, Philadelphia, PA, for defendant.

## MEMORANDUM AND ORDER

DITTER, District Judge.

The defendant, Jerry Polin, was convicted of making a destructive device and attempting to destroy by fire the Whitemarsh Plaza Building in Whitemarsh Township, Pennsylvania. Mr. Polin moves for a new trial on the basis of five alleged trial errors. I have carefully considered his arguments as well as

the possibility that his conviction resulted in a miscarriage of justice and have decided defendant's motion must be refused.

## I. *The Trial*

### A. The Government's Case

The government put on the following case against Jerry Polin. At approximately 3:00 a.m. on January 2, 1990, a fire began at the Whitemarsh Plaza Building, 15 East Ridge Pike, Conshohocken, Pennsylvania. Firefighters discovered smoke emanating from a vacant, locked office on the second floor. Breaking down the door, they found a charred, five-gallon, metal Charles Chips container on the floor inside.[1] Several wires ran through the lid of the can connecting a 24–hour timer, which was plugged into a nearby wall receptacle, to a light fixture inside. Investigators later found inside the can burnt remnants of gasoline-soaked newspaper, two lightbulbs,[2] a can of brake fluid, two cans of wire dryer (a highly volatile mixture), and several brown, liquid-containing bottles.

According to James D. Powell, an explosives enforcement officer with the Bureau of Alcohol, Tobacco, and Firearms, this device (or "bomb") was intended to create "a very large fire." (N.T., 1/24/92, at 16). The building was only saved, Officer Powell opined, because the lid had been left on the can depriving the bomb of sufficient oxygen for combustion. (*Id.* at 15.)

On the floor near the bomb, Whitemarsh Township Fire Marshal Calvin Bonenberger testified, were "burnt remnants of filters like air filters, and there was one all rumpled up air filter, and ... remnants of a cardboard box that I secured." (N.T., 1/21/92, at 28).

Jerry Polin's business, a medical claims processing company called Data Med, Ltd., was right next door. More specifically, Data Med's computer room was directly adjacent to the vacant office where the bomb had been set. The government presented one piece of direct evidence linking Polin to the bomb: a palm print found on one light bulb inside the can which matched Jerry Polin's. (*See* Testimony of Richard Leas, FBI fingerprint specialist, N.T., 1/22/92, at 156–60).

The rest of the government's evidence was circumstantial. Polin admitted he spent time at Data Med the evening of New Year's Day, 1990, approximately nine hours before the bomb was set to ignite. There is some dispute as to whether he was there until 6:30 p.m. or 7:30 p.m., but he does not contest that he was in his office at least briefly that evening.

Fire Marshal Bonenberger also testified that in Polin's personal office, he found two air filters which precisely matched the ones whose remnants he found near the device.

Both Bonenberger and Whitemarsh Detective Scott McElree testified that they saw an imprint or impression in Polin's office rug which matched the dimensions of the cardboard box whose remnants Bonenberger had found in the vacant office.

Bonenberger and McElree also opined that two ceiling tiles above Data Med's computer had been moved some time before the fire (presumably, to help the fire spread). (N.T., 1/21/92, at 32; 1/23/92, at 97). They further said they believed that the tiles had been moved from inside Data Med's computer room, and not from the vacant office next door. (N.T., 1/21/92, at 31; 1/23/92, at 97). They concluded that the culprit therefore had access to Data Med's computer room as well as to the vacant office the night of the fire.

John Scharff, a locksmith hired to change the locks at Data Med in November, 1989, testified that Jerry Polin had once told him he knew how to pick locks and that he owned lockpicking tools. (N.T., 1/23/92, at 8, 13). Michael McCurdy, manager of the Whitemarsh Plaza Building in 1989, testified that Polin had once told him exactly the same

---

1. Charles Chips products are delivered door to door by driver-salesmen. Efforts to trace this particular can were unsuccessful. (*See* N.T., 1/21/92, at 81–82, 1/23/92, at 32–33).

2. There was some dispute over whether the bomb contained two or three lightbulbs. *See, e.g.,* testimony of Detective Scott McElree (N.T., 1/23/92, at 101).

thing. (*Id.* at 19–20).[3]

Sheila Devine, to whom Jerry Polin sold Data Med in April, 1990, testified that approximately one week after the fire, Polin described to her in detail the components of the bomb. According to Fire Marshal Bonenberger, this was long before those details were publicly disclosed. Ms. Devine stated:

A. He told me that it had been set to go off at about 3 in the morning on New Year's Day eve, and that it had been set in an empty Charlie Chips can, and into that can was placed numerous brown pharmacy bottles filled with a flammable material. On top of that was placed a naked lightbulb, which was plugged into a timer, which was set to go off at 3 in the morning.

Q. Did you ask him how he knew about all this?

A. Yes, I did. He said he read it in the newspaper.

(N.T., 1/22/92, at 86).

ATF Special Agent Richard Weber later testified that his investigation had disclosed that no newspaper ever printed the details of the makeup of this bomb. (N.T., 1/23/92, at 28–32).

Detective McElree also testified that before he left Jerry Polin's office the night of the fire, he looked on Polin's desk for a photograph to see if this Jerry Polin whose office had just been damaged was the same Jerry Polin who had designed and installed the Whitemarsh Township police department's security system. (It was.) McElree saw no family pictures. (N.T., 1/23/92, at 103–04). Earlier, Data Med's data entry clerk, Agnes Laskey, had testified that Polin usually kept a family photograph on his desk. (N.T., 1/22/92, at 63). Indeed, that photograph was visible in another picture of Polin's office taken some time before the fire (Defense Exhibit 11B, testimony of Detective McElree, N.T., 1/23/92, at 103). In its closing, the government suggested that Polin had deliberately removed his family photograph from the office before setting the bomb he believed would burn the building down.

The government also presented evidence that Data Med was in financial trouble. Polin testified he had bought the company for $25,000 in 1988 but that in 1989, it lost approximately $30,000. (N.T., 1/27/92, at 64). Agnes Laskey, the data entry clerk, testified that customers were dissatisfied and going elsewhere. (N.T., 1/22/92, at 63). Polin himself admitted business had been bad (N.T., 1/27/92, at 28, 60) and that Data Med owed approximately $10,000 in back rent and more than that amount in legal and other professional fees. (N.T., 1/22/92, at 80–81; 1/27/92, at 60). Finally, the government emphasized that Polin maintained a $70,000 insurance policy on Data Med.

## B. The Defense

Polin's defense consisted mainly of character testimony and an effort to shift suspicion to Data Med's prior owner, Howard Karpo. The character evidence was extensive and impressive. Polin presented 11 witnesses who testified to his reputation as a trustworthy and law-abiding citizen. These witnesses included a rabbi, a cantor, three family members, and six friends and business associates. (*See* N.T., 1/24/92, at 23–39; 1/27/92, at 2–17). Nine other friends and relatives stood to vouch for Polin's reputation on the record. (*See* N.T., 1/27/92, at 17–21).

On direct examination, Polin testified to his own experience as a successful, trusted computer engineer. Before purchasing Data Med, he had designed and installed security systems for several police departments, including Whitemarsh Township's. He said he enjoyed significant professional trust, particularly with law enforcement clients:

We had access to rather confidential information. We had access to in some cases the keys to the police department. At Cheltenham they gave me the key to the building so that as we installed various things in the building we didn't have to run around getting keys to areas. In fact, the only key that I didn't have was to the evidence locker.

(N.T., 1/27/92, at 24).

Polin also testified he held positions of trust and responsibility in his religious com-

---

**3.** This testimony was evidently introduced to suggest that Jerry Polin could gain access to the vacant storage room, even if he did not have a key.

munity. His synagogue, Congregation Melrose B'nai Israel, entrusted him with all the codes to its alarm and entrance systems and relied on him to unlock the building each morning for worship services. (Testimony of Rabbi Isaac Moseson, N.T., 1/24/92, at 23–24).[4]

Polin was a civic leader as well. After leaving the army in 1955, he helped to found the Cheltenham Auxiliary Police, in which he then served for over 22 years. (N.T., 1/27/92, at 24).

In addition, Polin sought to shift suspicion for this crime to Howard Karpo, owner of Data Med until July, 1988. After his purchase, Polin permitted Karpo free access to Data Med so that Karpo could continue to process the medical claims of his brother, Dr. Stanley Karpo, and his son, Dr. Mark Karpo, both of whom were podiatrists. In November, 1988, however, Polin explained that he learned from a Medicaid fraud investigator, Matthew Schneck, that Dr. Stanley Karpo was under investigation. Polin promptly turned over Data Med records which could have evidenced Stanley Karpo's false claims. Polin intimated at trial that it was because of this information from Schneck that he changed Data Med's locks and passwords and barred the Karpos all further access to the company. Shortly thereafter, Polin and Howard Karpo stopped speaking. (N.T., 1/27/92, at 100–01).

Defense counsel suggested, therefore, that Howard Karpo had ample motive to destroy Data Med's offices. He suggested Karpo wanted both to avenge this betrayal by Polin and, more importantly, to destroy all other Data Med files which could have incriminated Karpo's brother.[5]

Finally, Polin tried to minimize or discredit the government's evidence against him. With regard to the palm print identified as his on the lightbulb, Polin had two responses.

First, his counsel tried to impeach the print identification itself. (See N.T., 1/22/92, at 162–71). Second, Polin testified that the culprit may have used a bulb from Polin's trouble light, a lamp he said he normally kept in his computer room but which had disappeared the night of the fire. (N.T., 1/27/92, at 49–50). This bulb, he explained, may have had his palm print on it. Detective McElree testified, however, that during an interview on September 11, 1990, Polin had said the bulb with his print on it probably came from a lamp owned by Howard Karpo which Polin had once helped carry from the vacant office to Karpo's car. (N.T., 1/23/92, at 108).

Polin also challenged most of the government's circumstantial evidence. With regard to the air filters found in his personal office which matched the brand of the crumpled, burnt ones found near the bomb, Polin testified that he had taken these filters from the vacant office to use as window screens, since the building's defective heating system made it necessary to open the windows even in December. (N.T., 1/27/92, at 36–37). Michael McCurdy, the property manager, confirmed these chronic heating problems. (N.T., 1/23/92, at 18).

Regarding Bonenberger and McElree's report of an imprint on Polin's office rug which matched the dimensions of the reconstructed cardboard box whose remnants Bonenberger found near the bomb, defense counsel elicited Bonenberger's admission that none of the numerous photographs of the fire scene showed this imprint. (N.T., 1/21/92, at 47). Defense counsel also argued that the matching of a burnt box remnant with a rug imprint two rooms away was weak evidence, at best.

The defense treated the ceiling-tile evidence with similar skepticism. Bonenberger and McElree had concluded the two tiles

---

4. Cantor Joshua Gordon of that congregation said under cross-examination, "I make a living at being a judge of human character." (N.T., 1/24/92, at 28). Of Jerry Polin he had said, "I believe him to be as totally truthful as any human being can possibly be. I have full faith and confidence in his word. I consider his word his bond." (Id. at 27).

5. Polin had articulated this suspicion about Howard Karpo from the beginning. Both he and Agent Schneck testified that later on January 2, 1990, the day of the fire—which was approximately four weeks after Polin had learned about the Karpo investigation—Polin called Schneck to report the fire and to suggest that Howard Karpo may have been responsible. (See N.T., 1/23/92, at 85.)

were moved prior to the fire because, they said, portions of the tiles appeared un-blackened by smoke. They had further opined that the tiles were moved from inside the computer room, rather than from the vacant office, because the dust above the computer room's ceiling, visible from the vacant office, had not been disturbed. Defense counsel argued vigorously that neither Bonenberger nor McElree could see any soot or dust anywhere until after three firefighters had burst into the rooms, moving ceiling tiles, spraying water, and causing general disruption. The defense emphasized: how reliable could observations of soot and dry dust be?

Next, with regard to Sheila Devine, Polin denied that he had *ever* disclosed the components of the bomb to her in detail, let alone during the first week of the fire. (N.T., 1/27/92, at 56, 104).

Neither Polin nor his counsel mentioned the missing family photograph.

Finally, as far as the government's theory of motive was concerned, Polin put on evidence that he was not so desperate for money that he would try to burn down his business. Ronald G. Cohen, a personal friend and the president of a similar data processing company, Datamation, Inc., testified he had told Polin throughout 1989 that he was interested in investing in Data Med because he believed the company had a good future. (N.T., 1/27/92, at 6-7). Polin also stated that he had other potential investors (*id.* at 28-29) and income from other sources (*id.* at 63), and that his wife's salary and fees exceeded $22,000 in 1989 (*id.* at 64).

The $70,000 insurance policy on the company he had bought for only $25,000, Polin explained, was purchased when he bought the company—18 months before the fire—as a result of several professional assessments that the computer's replacement value would be $56,000. (N.T., 1/27/92, at 79-80). Polin also testified that he never received any insurance money for the damage.

The jury deliberated less than two hours. It returned a verdict of guilty on both counts.

## II. *Alleged Trial Errors*

I begin with the six errors Polin alleges I made at trial. I will stand by my five rulings to which he objected unsuccessfully at trial. The sixth alleged error, which concerns hearsay by Agent Matthew Schneck and which Polin addresses in this motion for the first time, fails under the plain error standard to warrant a new trial. I will consider Polin's arguments in the order he presented them.

### A. The Cross–Examination of Special Agent Weber

#### 1. *The Sprinkler System*

■ Polin argues I erred in limiting defense counsel's cross-examination of ATF Special Agent Richard Weber about Weber's prior grand jury testimony. Weber had told the grand jury the Whitemarsh Plaza Building had a sprinkler system.[6] In fact, the building had no sprinkler system. Weber admitted his mistake at trial.[7] I concluded, therefore, that permitting either further cross-examination or the introduction of Weber's actual grand jury testimony would be error.

The rest of Weber's grand jury testimony was not relevant, because it would not have served to impeach Weber's credibility. Web-

---

6. Weber's grand jury testimony, read at sidebar, was as follows:

The Witness [Weber]: I also think there was a sprinker alarm or system installed rather recently.
A Juror: Recently, after he purchased the business?
The Witness: Recently, before the fire.
A Juror: But after this gentleman—after Mr. Polin had purchased this particular business?
The Witness: Yes, it was installed after he purchased it.
(N.T., 1/23/92, at 43).

7. His cross-examination went as follows:

Q. Do you recall telling the Grand Jury all about the sprinkler systems at this building?
A. I certainly do.
Q. Did they have sprinkler systems at this building?
A. No, they did not.
Q. Then why are you telling the Grand Jury they did?
A. Because I think if you read the record it says I think they had a sprinkler system because afterwards I subsequently found out they do not have a sprinkler system.
N.T., 1/23/92, at 42.

er had already admitted his earlier testimony was wrong. Defense counsel stated at sidebar he was not alleging Weber intentionally tried to mislead the grand jury. (N.T., 1/23/92, at 44, 46). Indeed, as I noted at the time, telling the grand jury there was a new sprinkler system tended to exculpate rather than inculpate Jerry Polin, if it had any effect at all, since a tenant who knew his building had a new sprinkler system would be *less* likely to try to set it on fire.

In any event, once Weber had admitted his earlier mistake, the grand jury testimony had no probative value and would have been a needless presentation of cumulative evidence. *See* Fed.R.Evid. 402, 403. It would have served merely to confuse the jury by emphasizing at undue length a marginal concern.

Finally, even if I erred in limiting Weber's cross-examination and excluding the grand jury transcript, a new trial would not be warranted. The absence of this peripheral testimony could not have substantially influenced the jury's ultimate decision. *See Government of Virgin Islands v. Bedford,* 671 F.2d 758, 762 (3d Cir.1982); *United States v. Bevans,* 728 F.Supp. 340, 343 (E.D.Pa.), *aff'd,* 914 F.2d 244 (3d Cir.1990). There is therefore no basis on this ground for a new trial.

### 2. The Insurance Money

Polin also contends that Agent Weber's other "false and misleading" statement to the grand jury—that Polin received "a negligible amount [of insurance money], maybe a few hundred dollars," (N.T., 1/23/92, at 57), when in fact he received nothing—is grounds to dismiss the indictment. It is not. An indictment will only be dismissed on the basis of prosecutorial misconduct in front of a grand jury if the defendant suffers actual prejudice. *See United States v. Soberon,* 929 F.2d 935, 939–40 (3d Cir.) (prejudice only exists if " 'the violation substantially influenced the grand jury's decision to indict,' or ... there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations" (quoting *Bank of Nova Scotia v. United States,* 487 U.S. 250, 256, 108 S.Ct. 2369, 2374, 101 L.Ed.2d 228

(1988))), *cert. denied,* —— U.S. ——, 112 S.Ct. 73, 116 L.Ed.2d 47 (1991).

Here, Agent Weber's statement does not even constitute prosecutorial misconduct—since, like the agent's statement about the sprinkler system, his assertion about negligible insurance money tended to undermine, not strengthen, Polin's alleged motive. Weber's statement could not have substantially influenced the grand jury's decision to indict. It therefore cannot serve as grounds for either a post-trial dismissal of the indictment or a grant of a new trial.

### B. Re-direct Testimony of Agent Schneck

Polin argues it was error to permit Medicaid Fraud Agent Matthew Schneck to testify to the hearsay statements of: 1) the confidential informant who reported Dr. Stanley Karpo's fraud, and 2) Dr. Karpo himself. The relevant portion of Agent Schneck's re-direct examination went as follows:

Q. Could you explain to the jury how you had received the information about those claims already?

A. Yes, sir. We—

MR. MADDEN: Objection, your Honor, beyond the scope.

THE COURT: I'll permit it.

A. We had a cooperating witness who was a former employee of Dr. Stanley Karpo's. This individual felt compelled to come to us because she became aware of various fraud or fraud in her mind that was occurring in Dr. Stanley Karpo's office. And she was able to identify patients for us as to never receiving surgical procedures yet having them billed to the Department of Public Welfare.

\* \* \* \* \* \*

Q. You stated earlier that you spoke with Dr. Stanley Karpo that day when you executed the search warrant; is that right?

A. That's correct.

Q. And did he say anything to you about who's responsible for the coding of the information on the claims that were submitted?

A. Dr. Karpo told me he was responsible for everything that went on them.

(N.T., 1/23/92, at 91–92).

Since defense counsel never objected to either statement on the ground of hearsay (defense counsel's first objection concerned only the scope of the re-direct), I must consider the admissibility of Schneck's statements under the plain error standard. *See* Fed.R.Crim.Proc. 51, 52(b). Pursuant to this standard, I should grant a new trial only if I made an error which "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *See Government of Virgin Islands v. Smith,* 949 F.2d 677, 686 (3d Cir.1991) (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)). "By its terms, recourse may be had to [Rule 52(b)] only ... from a trial infected with error so 'plain' the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it." *United States v. Frady,* 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982).

■ Neither of Schneck's statements constitutes such plain error. First, Schneck's testimony about the cooperating witness was not hearsay. Schneck testified that the informant came to his office "aware" of Dr. Karpo's fraud and that she "was able to identify" patients who had not undergone reported procedures. No statement of the informant's was offered. Moreover, what Schneck said he learned about Stanley Karpo's alleged fraud was not offered to prove that there was fraud, but rather to suggest the state of mind of his brother, Howard. Under rule 801(c), the testimony was not hearsay. There was no error, plain or otherwise.

■ By contrast, Schneck's testimony about Dr. Karpo's statement was hearsay. Nonetheless, it does not constitute error "so 'plain' the ... prosecutor [and I] were derelict in countenancing it." *Id.* The defendant is apparently arguing that Stanley Karpo's admission of responsibility for the coding prejudiced the defendant's theory that Howard Karpo thought he could protect his brother by destroying Data Med's computer. However, Stanley Karpo only admitted that he was responsible for the information coding, not that the information represented by his coding was fraudulent. Moreover, a plain blow to the defendant's theory does not automatically constitute plain error which infects the integrity of the trial. Howard Karpo's motivations were no doubt important to Jerry Polin at trial. But still, Howard Karpo, and even more so his brother, Stanley Karpo, remain peripheral to this prosecution. The admission of Schneck's single hearsay statement is not grounds for a new trial.

C. Testimony of Detective McElree

■ Next, Polin contends I erred in letting Detective McElree state his opinion that two ceiling tiles over Data Med's computer had been moved before the fire. I overruled defense counsel's objection to the admission of this opinion. (N.T., 1/23/92, at 97). Federal Rule of Evidence 701 permits opinion testimony by lay witnesses where those "opinions or inferences [are] limited to those inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Fed.R.Evid. 701.

McElree's testimony was rationally based on his own observation, and it helped explain his conclusion that the arsonist in this case had visited Data Med's computer room sometime the night of the fire. The jurors were free to distrust McElree's credibility, or the wisdom or logic of his conclusions, as defense counsel urged. Nonetheless, the testimony was properly admitted.[8]

D. Testimony of Sheila Devine

Next, Polin argues it was error to deny his motion to strike the testimony of Sheila Devine. Ms. Devine, who bought Data Med

---

8. Even if admission of the testimony were error, it cannot be said to have substantially influenced the jury's decision. *See Bedford,* 671 F.2d at 762; *Bevans,* 728 F.Supp at 343. That the culprit entered Data Med's computer room does not mean it was Jerry Polin; if the culprit could enter the vacant office without authorization, he or she could probably have entered Data Med's suite the same way. No new trial is warranted on this basis.

from Polin four months after the fire, testified that approximately one week after the fire, Polin described the components of the bomb to her in detail. When asked if she knew how Polin had this information, she said Polin had told her he read it in the newspaper. (N.T., 1/22/92, at 86). Devine further testified that during investigative interviews in 1990 with Fire Marshal Bonenberger, Lieutenant John Durante, and Agent Weber, she recounted this January, 1990, conversation to them. On cross-examination, Agent Weber stated that he did not recall her telling him about this conversation. (N.T., 1/23/92, at 41).

In response to a Jencks Act request[9] from defense counsel, the government produced only one report of an interview with Devine which had been conducted by Agent Weber in June, 1991. Weber, Bonenberger, and Durante maintained that they had no other reports from conversations with her.

Polin moved to strike Devine's testimony on the ground that the government was withholding the three agents' reports of Devine's pre-trial statements. Alternatively, Polin argued that if it is true that no other reports exist, it is because Devine did *not* tell the agents something as significant as that alleged conversation with Polin (presumably because it never happened). Polin therefore charges that the government violated its duty under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to disclose this exculpatory information.

I hold that my refusal at trial to strike Devine's testimony was correct. In light of the averments of the assistant United States attorney and the testimony of the three agents that they made no reports of talks with Devine in 1990, I cannot say the government failed to satisfy its disclosure requirements under the Jencks Act or Federal Rule of Civil Procedure 26.2. I have no reason to believe the government possessed any interview reports which it withheld from the defense. Rule 26.2 does not impose on law enforcement officers a duty to take notes or to make a report of an interview with a witness. What it requires is that the government produce for the defense any contempo-

raneously recorded, relevant statements made by that witness. Here, no such statement was recorded.

■ Polin's *Brady* argument must also fail. Agent Weber said he did not recall Devine's telling him of her bomb-contents conversation with Polin. (N.T., 1/23/92, at 41). Since Devine said she had reported that conversation, Weber contradicted her. While his lack of knowledge about such a conversation between Polin and Devine cast doubt on Devine's credibility, and thus was exculpatory information, the government's failure to produce it did not violate *Brady*. *Brady* requires disclosure of what the government knows, or knows it does not know—but it does not require disclosure of what a government agent has forgotten (and therefore does not know).

Defense counsel could and did argue at trial that the absence of investigative reports pointed to the agents' unprofessionalism or the credibility of Sheila Devine or both. The jury had those arguments before it. Devine's testimony was properly admitted, and the motion to strike properly refused.

### E. The 1989 Tax Return

■ Finally, Polin argues I erred in allowing the government to cross-examine him concerning his failure to file a federal income tax return in 1989. I overruled his objection holding that the matter was a proper subject for rebuttal of the positive character testimony introduced by the defendant. (N.T., 1/27/92, at 69–70).

Federal Rule of Evidence 404(a)(1) permits the admission of "evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same." Fed. R.Evid. 404(a)(1). The defendant called 11 character witnesses to testify to his reputation as a law-abiding citizen and had nine more put their agreement on record. Failure to file a tax return constitutes breaking the law. For that reason, the government's line of questioning was admissible to rebut those 20 witnesses' testimony.

---

**9.** *See* 18 U.S.C. § 3500 (1985); Federal Rule of Criminal Procedure 26.2.

Even if it were error, there was no reasonable probability that this line of questioning had a substantial influence on the jury's decision. Polin explained he had been granted several legal extensions on the filing that year. (N.T., 1/27/92, at 64–65). Defense counsel had ample opportunity to argue that Polin's one failure to file a tax return, in the year he was hampered by a criminal investigation, did not in any way negate the thrust of those character witnesses' testimony about Polin's respect for his community and the law. No new trial is warranted on this basis.

### III. *Miscarriage of Justice*

Although I conclude, for the reasons just stated, that there were no trial errors warranting the grant of defendant's motion, I must still order a new trial if "the interest of justice" so requires. Fed.R.Crim.P. 33. Justice demands a new trial only "if the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred." *United States v. Thomas*, 772 F.Supp. 674, 675 (D.D.C.1991) (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir.1980)). *See also Tibbs v. Florida*, 457 U.S. 31, 37–38, 102 S.Ct. 2211, 2215–2216, 72 L.Ed.2d 652 (1982).

It has been said that in weighing trial evidence post-trial, I am to sit as a thirteenth juror. *See United States v. Phifer*, 400 F.Supp. 719, 722 (E.D.Pa.1975), *aff'd*, 532 F.2d 748 (3d Cir.1976); 3 Charles A. Wright, *Federal Practice and Procedure: Criminal 2d* § 553, at 248 (1982 & Supp.1989). However, it is clear that I could not simply substitute my own judgment for that of the jury without seriously undermining the integrity of our trial system. *See United States v. Levy*, 694 F.Supp. 1136, 1145 (D.N.J.1988) (rejecting the thirteenth juror notion).

More persuasive is the more recent formulation of certain courts of appeals which have narrowed the weight of evidence inquiry to focus on the defendant's innocence. *See, e.g., United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir.1992) ("The test is whether 'it would be a manifest injustice to let the guilty verdict stand'. . . . There must be a real concern that an innocent person may have been convicted"); *United States v. Morales*, 902 F.2d 604, *op. amended*, 910 F.2d 467, 468 (7th Cir.1990) ("If the complete record, testimonial and physical, leaves a strong doubt as to the defendant's guilt, even though not so strong a doubt as to require a judgment of acquittal, the district judge may be obliged to grant a new trial").

A "real concern" that an innocent person may have been convicted, or a "strong doubt" that the defendant is guilty arises only if the credible trial evidence weighs more heavily in his favor than against it. Clearly, here, some significant evidence was presented which weighed against the guilty verdict. The weight and quantity of Polin's character testimony—attesting that he was a trusted, honest, and law-abiding community leader—caused me, at least, to question whether Jerry Polin would commit a crime that had such potential magnitude for loss, both in economic terms and in terms of physical danger to firefighters, police, and neighbors, just because his business was going badly.

Nonetheless, I do not find that the weight of the credible evidence against a guilty verdict outweighs the credible evidence which supported that verdict. There is no question arson was committed in the vacant office next to Polin's office on January 2, 1990. Polin visited his office approximately nine hours before the bomb, which was connected to a 24–hour timer, was set to ignite. His palm print was found on one of the light bulbs inside the bomb. The family picture he had kept on his desk was missing.

While I may have found *reasonable doubt* as to Polin's guilt had I been a juror, I do not find that a majority of the credible trial evidence weighs in Polin's favor. Therefore, I find no miscarriage of justice and must refuse Polin's motion for a new trial.

An order and date for sentencing follow.

### ORDER

AND NOW, this 16th day of June, 1993, defendant's motion for a new trial is hereby refused.

Mr. Polin is to report to courtroom 6A of the Federal Courthouse for sentencing at 10:00 a.m. on Friday, July 16, 1993.

## ORDER

AND NOW, this 16th day of June, 1993, defendant's motion for a judgment of acquittal is hereby refused for the reasons expressed in the opinion which accompanies my order refusing defendant's motion for a new trial.